1

2  **PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

3  Thomas D. Warren (State Bar No. 160921)
   twarren@piercebainbridge.com

4  Andrew Calderón (State Bar No. 316673)
   acalderon@piercebainbridge.com

5  355 S. Grand Avenue, 44th Floor

6  Los Angeles, CA 90071
   Telephone: (213) 262-9333

7  Facsimile: (213) 279-2008

8  Dwayne D. Sam (*pro hac application forthcoming*)

9  dsam@piercebainbridge.com

10 600 Pennsylvania Avenue NW
   South Tower, Suite 700

11 Washington, DC 20004
   Telephone: (202) 843-8342

12 Facsimile: (646) 968-4125

13 *Counsel for Plaintiff Robert Ross*

14

15                    THE UNITED STATES DISTRICT COURT

16                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

17

18 ROBERT ROSS,                          Case No. 3:19-cv-6669

19              Plaintiff,               **CIVIL COMPLAINT**

20       v.

21 AT&T MOBILITY, LLC,                   **DEMAND FOR JURY TRIAL**

22              Defendant.

23

24

25

26

27

28

## I.   NATURE OF THE ACTION

1.     This action arises out of AT&T's failure to protect the sensitive and confidential account data of its mobile service subscriber, Robert Ross, resulting in massive violations of Mr. Ross's privacy, the compromise of his highly sensitive personal and financial information, and the theft of more than $1 million.

2.     AT&T is the country's largest mobile service provider.  Tens of millions of subscribers entrust AT&T with access to their confidential information, including information that can serve as a key to unlock subscribers' highly sensitive personal and financial information.

3.     Recognizing the harms that arise when mobile subscribers' personal information is accessed, disclosed, or used without their consent, federal and state laws require AT&T to protect this sensitive information.

4.     AT&T also recognizes the sensitivity of this data and promises its subscribers that it "will protect [customers'] privacy and keep [their] personal information safe" and that it "will not sell [customers'] personal information to anyone, for any purpose. Period."  AT&T repeatedly broke these promises.

5.     In an egregious violation of the law and its own promises, and despite advertising itself as a leader in technological development and as a cyber security-savvy company, AT&T breached its duty and promise to Mr. Ross to protect his account and the sensitive data it contained.  AT&T failed to implement sufficient data security systems and procedures, instead allowing third parties to gain unauthorized access to Mr. Ross's AT&T account in order to steal from him.

6.     AT&T's actions and conduct were a substantial factor in causing significant financial and emotional harm to Mr. Ross and his family.  But for AT&T employees' unauthorized access to Mr. Ross' account, and AT&T's failure to protect Mr. Ross through adequate security and oversight systems and procedures, Mr. Ross would not have had his personal privacy repeatedly violated and would not have been a victim of SIM swap theft.

1      7.      Mr. Ross brings this action to hold AT&T accountable for its

2  violations of federal and state law, and to recover for the grave financial and

3  personal harm suffered by Mr. Ross and his family as a direct result of AT&T's

4  acts and omissions, as detailed herein.

5  **II.    THE PARTIES**

6      8.      Plaintiff Robert Ross is, and at all relevant times was, a resident of

7  California.  Mr. Ross currently resides in San Francisco, California.

8      9.      Mr. Ross was an AT&T mobile customer at all times relevant to this

9  Complaint.  He purchased a mobile phone plan from AT&T in San Francisco,

10  California in 2007 for personal use, was an active, paying AT&T mobile subscriber

11  at all times relevant to the allegations in this Complaint.

12      10.      Defendant AT&T Mobility, LLC (hereinafter, "AT&T") is a Delaware

13  limited liability corporation with its principal office or place of business in

14  Brookhaven, Georgia.  AT&T "provides nationwide wireless services to consumers

15  and wholesale and resale wireless subscribers located in the United States or U.S.

16  territories" and transacts or has transacted business in this District and throughout

17  the United States.  It is the second largest wireless carrier in the United States, with

18  more than 153 million subscribers, earning $71 billion in total operating revenues

19  in 2017 and $71 billion in 2018.  As of December 2017, AT&T had 1,470 retail

20  locations in California.[1]

21      11.      AT&T provides wireless service to subscribers in the United States.

22  AT&T is a "common carrier" governed by the Federal Communications Act

23  ("FCA"), 47 U.S.C. § 151 *et seq.*  AT&T is regulated by the Federal

24  Communications Commission ("FCC") for its acts and practices, including those

25  occurring in this District.

26

27

28

---

[1] "About Us," AT&T, *available at* https://engage.att.com/california/about-us/.  All URLs in this complaint were last accessed on October 15, 2019.

1    12.    AT&T Inc., AT&T's parent company, acknowledged in its 2018

2   Annual Report that its "profits and cash flow are largely driven by [its] Mobility

3   business" and "nearly half of [the] company's EBITDA (earnings before interest,

4   taxes, depreciation and amortization) come from Mobility."[2]

5   **III.    JURISDICTION AND VENUE**

6    13.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331

7   because this case arises under federal question jurisdiction under the Federal

8   Communications Act ("FCA").  The Court has supplemental jurisdiction under 28

9   U.S.C. § 1367 over the state law claims because the claims are derived from a

10   common nucleus of operative facts.  The Court also has jurisdiction over this

11   action pursuant to 28 U.S.C. § 1332 because Mr. Ross is a citizen of a different

12   state than AT&T.

13    14.    This Court has personal jurisdiction over AT&T because AT&T

14   purposefully directs its conduct at California, transacts substantial business in

15   California (including in this District), has substantial aggregate contacts with

16   California (including in this District), engaged and is engaging in conduct that has

17   and had a direct, substantial, reasonably foreseeable, and intended effect of causing

18   injury to persons in California (including in this District), and purposely avails

19   itself of the laws of California.  AT&T had more than 33,000 employees in

20   California as of 2017, and 1,470 retail locations in the state.[3]  Mr. Ross purchased

21   his AT&T mobile plan in California, visited AT&T retail locations in California,

22   and was injured in California by the acts and omissions alleged herein.

23    15.    In accordance with 28 U.S.C. § 1391, venue is proper in this District

24   because a substantial part of the conduct giving rise to Mr. Ross' claims occurred

25   in this District and Defendant transacts business in this District.  Mr. Ross

26

27

28   [2] *Id.*
   [3] "About Us," AT&T California, *supra* at 1.

purchased his AT&T mobile plan in this District and was harmed in this District, where he resides, by AT&T's acts and omissions, as detailed herein.

## IV.   ALLEGATIONS APPLICABLE TO ALL COUNTS

16.   As a telecommunications carrier, AT&T is entrusted with the sensitives mobile account information and personal data of millions of Americans, including Mr. Ross' confidential and sensitive personal and account information.

17.   Despite its representations to its customers and its obligations under the law, AT&T has failed to protect Mr. Ross' confidential information.  In October 2018, AT&T employees obtained unauthorized access to Mr. Ross' AT&T mobile account, viewed his confidential and proprietary personal information, and transferred control over Mr. Ross' AT&T mobile number from Mr. Ross' phone to a phone controlled by third-party hackers.  The hackers then immediately utilized their control over Mr. Ross' AT&T mobile number—control secured with necessary and direct assistance from AT&T employees—to access his personal and digital finance accounts and steal $1 million from Mr. Ross.

18.   This type of telecommunications account hacking behavior is known as "SIM swapping."

### A.   SIM Swapping is a Type of Identity Theft Involving the Transfer of a Mobile Phone Number

19.   Mr. Ross was the target of a "SIM swap" on October 26, 2018.

20.   "SIM swapping" refers to a relatively simple scheme, wherein third parties take control of a victim's mobile phone number.  The hackers then use that phone number as a key to access and take over the victim's digital accounts, such as email, file storage, and financial accounts.

21.   Most mobile phones, including the iPhone owned by Mr. Ross at the time of his SIM swap, have an internal SIM ("subscriber identity module") card.  A SIM card is a small, removable chip that allows a mobile phone to communicate with the mobile carrier's network and the carrier to know what subscriber account

is associated with that mobile phone.  The connection between the mobile phone and the SIM card is made through the carrier, which associates each SIM card with the physical phone's IMEI ("international mobile equipment identity"), which is akin to the mobile phone's serial number.  Without an activated SIM card and effective SIM connection, a mobile phone typically cannot send or receive calls or text messages over the carrier network.  SIM cards can also store a limited amount of account data, including contacts, text messages, and carrier information, and that data can help identify the subscriber.

22.    The SIM card associated with a mobile phone can be changed.  If a carrier customer buys a new phone that requires a different sized SIM card, for example, the customer can associate his or her account with a new SIM card and the new phone's IMEI by working with their mobile carrier to effectuate the change.  This allows carrier customers to move their mobile number from one mobile phone to another and to continue accessing the carrier network when they switch mobile phones.  For a SIM card change to be effective, the carrier must authenticate that the request is legitimate and actualize the change.  AT&T allows its employees to conduct SIM card changes for its customers remotely or in its retail stores.

23.    An unauthorized SIM swap refers to an illegitimate SIM card change.  During a SIM swap attack, the SIM card number associated with the victim's mobile account is switched from the victim's phone to a phone controlled by a third party.  This literally re-routes the victim's mobile phone service — including any incoming data, texts, and phone calls associated with the victim's phone — from the victim's physical phone to a physical phone controlled by the third party (also referred to herein as a "hacker").  The hacker's phone then becomes the phone associated with the victim's carrier account, and the hacker receives all of

1    the text messages and phone calls intended for the victim.[4]  Meanwhile, the

2    victim's mobile phone loses its ability to connect to the carrier network.

3         24.    Once hackers have control over the victim's phone number, they can

4    immediately use that control to access and take complete control of the victim's

5    personal online accounts, such as email and banking accounts, through exploiting

6    password reset links and codes sent via text message to the now-hacker-controlled-

7    phone or the two-factor authentication processes associated with the victim's

8    digital accounts.  Two-factor authentication allows digital accounts to be accessed

9    without a password or allows the account password to be changed.  One common

10   form of two-factor authentication is through text messaging.  Rather than enter a

11   password, the hacker requests that a password reset link or code be sent to the

12   mobile phone number associated with the victim's online account.  Because the

13   hacker now controls the victim's phone number, the reset code is sent to the

14   hacker.  The hacker can then log into, and change the password for, the victim's

15   account, allowing the hacker to access and take complete control of the contents of

16   the account.[5]

17        25.    Therefore, obtaining access to and control over a victim's mobile

18   phone service is a central part of breaking into the victim's other online accounts,

19   such as email services or financial accounts.

20

21

22   [4] As described by federal authorities in prosecuting SIM swap cases, SIM swapping enables
     hackers to "gain control of a victim's mobile phone number by linking that number to a

23   subscriber identity module ('SIM') card controlled by [the hackers]—resulting in the victim's
     phone calls and short message service ('SMS') messages being routed to a device controlled by

24   [a hacker]." *United States of America v. Conor Freeman, et al.*, No. 2:19-cr-20246-DPH-APP
     (E.D. Mich. Filed Apr. 18, 2019) (hereafter, "Freeman Indictment") (attached hereto as Exhibit

25   A), ECF. No. 1 at ¶ 3.

26   [5] *See, e.g., Id.* at ¶ 4 ("Once [hackers] had control of a victim's phone number, it was leveraged
     as a gateway to gain control of online accounts such as the victim's email, cloud storage, and

27   cryptocurrency exchange accounts. Sometimes this was achieved by requesting a password-reset
     link be sent via [text messaging] to the device control by [hackers].  Sometimes passwords were

28   compromised by other means, and [the hacker's] device was used to received two-factor
     authentication ('2FA') message sent via [text message] intended for the victim.").

26.     The involvement of a SIM swap victim's mobile carrier is critical to an effective SIM swap.  In order for a SIM swap to occur and for a SIM swap victim to be at any risk, the carrier must receive a request to change a victim's SIM card and effectuate the transfer of the victim's phone number from one SIM card to another.

27.     Upon information and belief, in Mr. Ross's case, not only did AT&T employees access his account without authorization, they also changed his SIM card number to a phone controlled by hackers, who then immediately used that control to steal from Mr. Ross.

**B.     AT&T Allowed Unauthorized Access to Mr. Ross' AT&T Account**

28.     AT&T employees accessed Mr. Ross' AT&T mobile account without his authorization, obtained his confidential and proprietary personal information, and gave complete control of his mobile service to hackers – all without Mr. Ross' knowledge or consent.  Those hackers then immediately used their control over Mr. Ross' mobile phone number to access ant take control of his sensitive and confidential information and accounts and steal more than $1 million from him.

29.     On October 26, 2018 at approximately 6:00 PM PT, Mr. Ross began receiving notifications that someone was attempting to withdraw currency from his account at Gemini, a provider of financial services.  This caused Mr. Ross significant distress because, at the time, Mr. Ross had $500,000 in USD in his Gemini account.

30.     At approximately the same time, Mr. Ross noticed that his AT&T mobile phone had lost service and displayed "No Service", and he also noticed that he was automatically logged out of his Gmail account.

31.     Mr. Ross immediately suspected that a hacker attack was underway and took his mobile phone to an Apple store for assistance.

32.     Apple representatives assisted Mr. Ross in contacting AT&T Customer Support.  At that time, an AT&T employee informed the Apple representatives that

– 7 –

1   Mr. Ross' SIM card had been changed.  AT&T employees advised the Apple

2   representatives to provide Mr. Ross with a new SIM card, and then Apple

3   employees replaced the SIM card in Mr. Ross' phone.  AT&T then activated the

4   new SIM card, restoring Mr. Ross' access to his AT&T mobile number and account

5   services.

6   33.    When Mr. Ross returned home that evening, he called AT&T's

7   customer service to discuss the unauthorized access to his account by AT&T

8   employees and the unauthorized SIM swap.  An AT&T representative who

9   identified himself as Ryan S. (with a representative identification number

10  RS410M) informed Mr. Ross that an unauthorized SIM swap had occurred on his

11  service at approximately 5:47 PM PT by AT&T representative Cristelo V. (with a

12  representative identification number CV921H).

13  34.    AT&T representative Ryan S. also informed Mr. Ross that this

14  unauthorized SIM swap request was made using customer owned and maintained

15  equipment ("COAM"), and explained that COAM is a mobile phone that is not

16  provided by AT&T and would generally be of unknown origin to AT&T (for

17  example, a hacker might purchase a used mobile phone on the internet).

18  Furthermore, Ryan S. expressed surprise that this SIM swap was executed as he

19  said it was against AT&T internal policies for an AT&T representative to execute a

20  COAM-originated SIM swap request from anyone calling in to an AT&T call

21  center. Ryan S further represented that he made a specific note of this violation of

22  AT&T's own policy in Mr. Ross' account, reading the note verbally to Mr. Ross "I

23  have informed customer that a SIM card and IMEI change occurred on 10/26/18 at

24  5:47pm. This change was approved by agent which is a direct violation of the ATT

25  activation policy."

26  35.    AT&T employees represented to Mr. Ross that AT&T would place a

27  warning on his account stating that he was experiencing fraud and instructing

28  AT&T employees not to change anything on his account – including his SIM card.

36.     AT&T informs its customers that verbal account passcodes—which are different than online account sign-in passwords or the passcodes used to access a mobile device—are used to protect customer's mobile accounts and may be required when a customer manages their AT&T account online or in an AT&T store.[6]

37.     Within minutes of AT&T giving control over Mr. Ross's AT&T mobile number to the hackers, they used that control to access and take over Mr. Ross' accounts at his financial services providers, including but not limited to, Coinbase, Gemini, and Binance. Coinbase and Gemini allow their users to store US dollars that can be used to buy and sell cryptocurrencies (such as bitcoin) within the user's account, in a similar way to how users can store US dollars used to buy and sell stocks at financial services providers such as Fidelity, Schwab, and E*Trade.

38.     At the time of the SIM swap attack, Mr. Ross had approximately $500,000 in US dollars in his Gemini account and approximately $500,000 in US dollars in his Coinbase account.  By utilizing their control over Mr. Ross' mobile phone number, which AT&T gave them, third-party hackers were able to access and take control of these accounts of Mr. Ross and control the entire USD amounts he held in both accounts.  The hackers used Mr. Ross's $1,000,000 in US dollars to purchase bitcoin—a type of cryptocurrency that can be difficult to trace—and then the hackers transferred that bitcoin into accounts they controlled at a different financial services provider.  This made the cryptocurrency exceedingly difficult to trace, let alone recover.[7]

---

[6] "Get info on passcodes for mobile accounts," AT&T, *available at* https://www.att.com/esupport/article.html#!/mobile/KM1049472?gsi=tp3wtr.

[7] *See* Investigation Report, Regional Enforcement Allied Computer Team, *California v. Nicholas Truglia* (Oct. 2018) (attached hereto as Exhibit B) at p. 8 ("explaining that "all of Robert R.'s funds stored in Coinbase (approximately $500,000) and Gemini (approximately $500,000) had been held in USD.  The [hacker] used all the funds in USD at both exchanges to purchase bitcoins, then immediately withdrew all of the bitcoins. … This information was subsequently verified by obtaining records directly from Coinbase and Gemini via search warrant.").

39.     The hackers also transferred cryptocurrency worth approximately $3,000 from Mr. Ross' Binance account into accounts they controlled, thereby stealing those funds from him as well.

40.     The hackers also used their control over Mr. Ross' AT&T mobile phone number to access, change the passwords, and take control of several of Mr. Ross' most sensitive online accounts, including, but not limited to, his Authy, Google, Yahoo!, and DropBox accounts. In taking over his Google account, the hackers also changed his passwords and the phone number linked to Mr. Ross' two-factor authentication for these accounts, which made it impossible for Mr. Ross to regain immediate access to, let alone control of, these accounts (because any requests to remind him of or reset the password no longer were sent to Mr. Ross' mobile phone, but rather to the hacker's phone).  It took Mr. Ross approximately 7-10 days to regain access to and restore control over his email and, and longer for his other online personal accounts, and several weeks to regain access to the accounts taken over at his other financial services providers.  In addition, the hackers deleted several weeks-worth of emails and substantial data from Mr. Ross' Google account.  Mr. Ross has not been able to recover any of this data.

41.     Criminal investigations by the California-based Regional Enforcement Allied Computer Team ("REACT"), a multi-jurisdictional law enforcement partnership specializing in cybercrime, into the October 2018 breach of Mr. Ross' AT&T account and the resulting theft revealed the involvement of a third-party hacker named Nicholas Truglia, who was arrested by REACT detectives on November 13, 2018, and faces 21 felony counts in Santa Clara County for SIM swaps and related thefts, including against Mr. Ross. In their investigation report, REACT detectives specifically wrote that they obtained a search warrant for AT&T records pertaining to these thefts, and in response, AT&T provided REACT investigators with records that showed the same mobile device used by the hacker

1   (identified through the devices IMEI number) had been used to effect the account

2   takeovers of Mr. Ross, as well as the accounts of several other victims. In total, the

3   records indicated that, prior to the unauthorized and illegal SIM swap and theft

4   facilitated by AT&T against Mr. Ross, 11 unique phone numbers had been SIM

5   swapped using this device between October 5 and October 26, 2018. It is

6   incredulous that AT&T not only allowed these other unauthorized SIM swaps to

7   happen, resulting in several other victims, but certainly knew or should have

8   known that the same mobile device used to SIM swap other victims was already

9   being used by a hacker who later used that same device to SIM swap Mr. Ross.

10  Even the most basic check by AT&T would have easily flagged this IMEI as being

11  used to perpetrate completely unauthorized and illicit SIM swaps well prior to the

12  unauthorized and illegal SIM swap against Mr. Ross, which resulted within 45

13  minutes of the theft of almost his entire lifes savings of $1,000,000.

14        42.   Mr. Ross' financial and personal life have been uprooted as a result of

15  AT&T's failure to safeguard his account.

16        43.   As a result of the SIM swap detailed above, Mr. Ross lost more than

17  $1 million in USD.  This money constituted the majority of Mr. Ross' life savings

18  and the money he had saved for his daughter's college fund as well as his own

19  retirement.

20        44.   The financial strain resulting from the robbery of Mr. Ross has caused

21  extreme emotional distress for Mr. Ross.  The loss of his savings caused massive

22  disruption in Mr. Ross' financial planning and caused him to worry about the

23  financial well-being of himself and his daughter.  He has suffered, and continues to

24  suffer, from severe anxiety, fear, weight gain, depression, and loss of sleep as a

25  direct result.

26        45.   Additionally, Mr. Ross' and his minor daughter's sensitive and

27  confidential personal information have been compromised as a result of the SIM

28  swaps.  Mr. Ross stored color copies of their passports, drivers' licenses, and birth

1    certificates in the online accounts which were taken over by the hackers as a result

2    of the AT&T-facilitated SIM swap.  Ten years of Mr. Ross' sensitive and

3    confidential tax returns were also compromised.  All of this information is now at

4    extraordinarily high risk of being posted or bought and sold on the dark web by

5    criminals and identity thieves, putting Mr. Ross and his minor child at ongoing risk

6    of significant privacy violations, identity theft, and countless additional unknown

7    harms for the rest of their lives.

8    **C.    AT&T's Failure to Protect Mr. Ross' Account from Unauthorized**

9    **Access Violates Federal Law**

10    46.    AT&T is the world's largest telecommunications company and

11    provider of mobile telephone services.  As a common carrier,[8] AT&T is governed

12    by the Federal Communications Act of 1934, as amended ("FCA"),[9] and

13    corresponding regulations passed by the FCC.[10]

14    47.    Recognizing the sensitivity of data collected by mobile carriers,

15    Congress, through the FCA, requires AT&T to protect Mr. Ross' sensitive personal

16    information to which it has access as a result of its unique position as a

17    telecommunications carrier.[11]

18    48.    Section 222 of the FCA, which became part of the Act in 1996,

19    requires AT&T to protect the privacy and security of information about its

20    customers.  Likewise, Section 201(b) of the Act requires AT&T's practices related

21    to the collection of information from its customers to be "just and reasonable" and

22    declares unlawful any practice that is unjust or unreasonable.[12]

23    49.    AT&T's most specific obligations to protect its customers concerns a

24    specific type of information, called CPNI.[13]  Specifically, the FCA "requires

25    [8] 47 U.S. Code § 153(51).

26    [9] 47 U.S.C. § 151 *et seq.*

27    [10] 47 C.F.R. § 64.2001 *et seq.*
      [11] 47 U.S.C. § 222.

      [12] 47 U.S.C. § 201(b).
28    [13] 47 U.S.C. § 222(a).

1   telecommunications carriers to take specific steps to ensure that CPNI is

2   adequately protected from unauthorized disclosure."[14]

3         50.    Carriers like AT&T are liable for failures to protect their customers

4   unauthorized disclosures.[15]   The FCC has also stated that "[t]o the extent that a

5   carrier's failure to take reasonable precautions renders private customer

6   information unprotected or results in disclosure of individually identifiable CPNI, .

7   . . a violation of section 222 may have occurred."[16]

8         51.    CPNI is defined as "information that relates to the quantity, technical

9   configuration, type, destination, location, and amount of use of a

10   telecommunications service subscribed to by any customer of a

11   telecommunications carrier, and that is made available to the carrier by the

12   customer solely by virtue of the carrier-customer relationship; and . . . information

13   contained in the bills pertaining to telephone exchange service or telephone toll

14   service received by a customer of a carrier."[17]

15         52.    As AT&T has admitted to customers, SIM swap attacks constitute a

16   CPNI breach.

17         53.    Mr. Ross' CPNI was breached by one or more AT&T employees when

18   they accessed his account and swapped his SIM card number without his

19   authorization.   When employees accessed Mr. Ross' account, his CPNI was visible.

20   On information and belief, this included, but was not limited to, information about

21   the configuration, type, and use of his subscribed AT&T services, his personal

22

23   ────────────

[14] Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of
Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of
Customer Proprietary Network Information and Other Customer Information*, 22 F.C.C. Rcd.
6927 ¶ 1 (April 2, 2007) (hereafter, "2007 CPNI Order").
[15] 47 U.S.C. §§ 206, 207.
[16] Declaratory Ruling, *In the Matter of Implementation of the Telecommunications Act of 1996:
Telecommunications Carriers' Use of Customer Proprietary Network Information & Other
Customer Information*, 28 F.C.C. Rcd. 9609 ¶ 30 (2013) (hereafter, "2013 CPNI Order").
[17] 47 U.S.C. § 222(h)(1).

1    information, his SIM card details, and his billing information.  AT&T employees

2    then used this information to effectuate an unauthorized SIM swap.

3          54.    This type of unauthorized use of Mr. Ross' CPNI is illegal under the

4    FCA.  The FCA forbids AT&T from "us[ing], disclos[ing], or permit[ting] access

5    to" CPNI, except in limited circumstances.[18]  This extends to the carrier's own

6    employees.

7          55.    AT&T may only use, disclose, or permit access Mr. Ross' CPNI: (1)

8    as required by law; (2) with his approval; or (3) in its provision of the

9    telecommunications service from which such information is derived, or services

10   necessary to or used in the provision of such telecommunications service.[19]

11   Beyond such use, "the Commission's rules require carriers to obtain a customer's

12   knowing consent before using or disclosing CPNI."[20]

13         56.    AT&T failed to protect Mr. Ross from authorized use of his CPNI.

14   AT&T permitted its employees to use and/or disclose Mr. Ross' CPNI without

15   obtaining Mr. Ross' knowing consent beforehand.  AT&T employees, acting within

16   the scope of their employment, likewise did not seek Mr. Ross' knowing consent

17   before using, disclosing, and/or permitting access to his CPNI when they accessed

18   his account and swapped his SIM card.  Instead, AT&T employees authorized a

19   COAM SIM swap over the phone, in violation of AT&T's own internal policies.

20   Because such conduct does not fit within the FCA's recognized legitimate uses, it

21   constitutes a violation of the FCA.

22         57.    Pursuant to the FCA, the FCC has developed comprehensive rules

23   concerning AT&T's obligations under its duty to protect customers' CPNI.[21]  This

24

---

25   [18] 47 U.S.C. § 222(c)(1).

     [19] 47 U.S.C. § 222.

26   [20] 2007 CPNI Order ¶ 8 (emphasis added).

     [21] *See* 47 CFR § 64.2001("The purpose of the rules in this subpart is to implement section 222 of
27   the Communications Act of 1934, as amended, 47 U.S.C. 222.").  The FCC also regularly
     releases CPNI orders that promulgate rules implementing its express statutory obligations.  *See*
28   2007 CPNI Order and 2013 CPNI Order.

includes rules "designed to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI."[22] The FCC specifically recognizes that "[a]bsent carriers' adoption of adequate security safeguards, consumers' sensitive information… can be disclosed to third parties without consumers' knowledge or consent."[23]  In a 2013 order, the FCC "clarif[ied] existing law so that consumers will know that *their carriers must safeguard these kinds of information so long as the information is collected by or at the direction of the carrier and the carrier or its designee[24] has access to or control over the information.*"[25]

58.    Pursuant to these rules, AT&T must "implement a system by which the status of a customer's CPNI approval can be clearly established *prior to* the use of CPNI."[26]  AT&T is also required to  "design their customer service records in such a way that the status of a customer's CPNI approval can be clearly established."[27]  The FCC's rules also "require carriers to maintain records that track access to customer CPNI records."[28]

59.    Upon information and belief, AT&T has failed to implement such a system.  The fact that Mr. Ross' account was accessed, and his SIM card number was changed without his authorization, demonstrates AT&T's failures in this regard.

60.    AT&T is also required to "train their personnel as to when they are and are not authorized to use CPNI, and carriers must have an express disciplinary process in place."[29]

---

[22] 2007 CPNI Order ¶ 9; *see also Id.* at ¶ 35; 47 U.S.C. § 222(c); 47 C.F.R. § 64.2009.
[23] *Id.*
[24] In the ruling, "designee" is defined as "an entity to which the carrier has transmitted, or directed the transmission of, CPNI or is the carrier's agent." *Id.* n. 1.
[25] *Id.* at ¶ 1 (emphasis added).
[26] 2007 CPNI Order ¶¶ 8-9 (emphasis added); *see also* 47 C.F.R. § 64.2009(a).
[27] *Id.* ¶ 9.
[28] *Id.*
[29] 47 C.F.R. § 64.2009(b).

61.    Upon information and belief, AT&T has failed to properly train and supervise their personnel, as reflected by an AT&T employee's involvement in Mr. Ross' breaches – and that employee's ability to effectuate a SIM swap in violation of AT&T's own internal policies.

62.    AT&T has also breached its duty to safeguard Mr. Ross' CPNI from data breaches, in violation of Section 222(a) and Section 201(b) of the FCA.

63.    The FCC has "[made] clear that carriers' existing statutory obligations to protect their customers' CPNI include[s] a requirement that carriers take reasonable steps, which may include encryption, to protect their CPNI databases from hackers and other unauthorized attempts by third parties to access CPNI."[30]

64.    AT&T failed to take reasonable steps to protect Mr. Ross' CPNI, thereby allowing third-party hackers to access his CPNI.

65.    The FCC also requires that carriers inform customers – and law enforcement – "whenever a security breach results in that customer's CPNI being disclosed to a third party without that customer's authorization."[31]  This requirement extends to *any* unauthorized disclosure.

66.    In adopting this requirement, the FCC rejected the argument that it "need not impose new rules about notice to customers of unauthorized disclosure because competitive market conditions will protect CPNI from unauthorized disclosure."[32]

67.    Instead, the FCC found that "[i]f customers and law enforcement agencies are unaware of [unauthorized access], unauthorized releases of CPNI will have little impact on carriers' behavior, and thus provide little incentive for carriers to prevent further unauthorized releases. By mandating the notification process adopted here, we better empower consumers to make informed decisions about

---

[30] 2007 CPNI Order ¶ 36 (citation omitted).
[31] 2007 CPNI Order at ¶ 26; *see also* 47 C.F.R § 64.2011(c).
[32] 2007 CPNI Order ¶ 30.

1    service providers and assist law enforcement with its investigations.  This notice

2    will also empower carriers and consumers to take whatever 'next steps' are

3    appropriate in light of the customer's particular situation."[33]  The FCC specifically

4    recognized that this notice could allow consumers to take precautions or protect

5    themselves "to avoid stalking or domestic violence."[34]

6         68.    AT&T failed in its duty to safeguard Mr. Ross' CPNI from breaches

7    and, upon information and belief, has failed to properly inform him of such

8    breaches when they occurred.  Mr. Ross never received any documentation or

9    communication alerting him that his CPNI had been breached, even though AT&T

10   knew his CPNI had been breached as a result of the REACT criminal investigation,

11   and knew or should have known that his CPNI had been breached as a result of

12   multiple prior SIM swaps enacted by hackers using the same mobile phone and

13   IMEI.

14        69.    Under the FCA, AT&T is not just liable for its own violations of the

15   Act, but also for violations that it "cause[s] or permit[s]."[35]  By failing to secure

16   Mr. Ross' account and protect his CPNI, AT&T caused and/or permitted Mr. Ross'

17   CPNI to be accessed and used by its own employees and by third-party hackers.

18        70.    AT&T is also responsible for the acts, omissions, and/or failures of

19   officers, agents, employees, or any other person acting for or employed by AT&T.

20        **D.    Mr. Ross' Harm was Caused by AT&T's Negligence**

21        71.    By failing to secure Mr. Ross' account—and protect the confidential

22   and sensitive data contained therein—and to properly hire, train, and supervise

23

24

25   _____
     [33] *Id.*

26   [34] *Id.* at n. 100.

27   [35] *See* 47 U.S.C.A. § 206 (establishing that "[i]n case any common carrier shall do, or cause or
     permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful,
     or shall omit to do any act, matter, or thing in this chapter required to be done such common

28   carrier shall be liable to the person or persons injured thereby for the full amount of damages
     sustained in consequence of any such violation of the provisions of this chapter[.]")

their employees, AT&T is responsible for the foreseeable harm Mr. Ross suffered as a result of AT&T's gross negligence.

72.    Further, AT&T is responsible for its employees' failure to obtain Mr. Ross' valid consent before accessing his account and effectuating a SIM swap, as such actions were within the scope of their employment with AT&T.  On information and belief, AT&T employees were tasked with and able to change customers' SIM card numbers at will – even when such changes violated AT&T company policy.

73.    Additionally, AT&T employees' breach of Mr. Ross' account and the subsequent SIM swap was foreseeable.

74.    AT&T has known for more than a decade that third parties frequently attempt to access and take over mobile customers' accounts for fraudulent purposes.

75.    In 2007, the FCC issued an order strengthening its CPNI rules in response to the growing practice of "pretexting."[36]  Pretexting is "the practice of pretending to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communication records."[37] This 2007 Order put AT&T on notice that its customers' accounts were vulnerable targets of the third-parties seeking unauthorized access.

76.    AT&T also knew, or should have known, about the risk SIM swap crimes presented to its customers.  SIM swap crimes have been a widespread and growing problem for years.  The U.S. Fair Trade Commission ("FTC") reported in 2016 that there were 1,038 reported SIM swap attacks *per month* in January 2013, which increased sharply to 2,658 per month by January 2016—2.5 times as many.[38]  The FTC reported that SIM swaps represented 6.3% of all identity thefts

---

[36] 2007 CPNI Order.
[37] *Id.* at ¶ 1.
[38] Lori Cranor, FTC Chief Technologist, "Your mobile phone account could be hijacked by an identity thief," Federal Trade Commission (June 7, 2016), *available at*

1  reported to the agency in January 2016, and that such thefts "involved all four of
2  the major mobile carriers" – including AT&T.[39]

3      77.    AT&T knew or should have known that it needed to take steps to
4  protect its customers.  The FTC's 2017 Report stated that "*mobile carriers are in a*
5  *better position than their customers to prevent identity theft through mobile*
6  *account hijacking*[.]"[40]  The FTC urged carriers like AT&T to "adopt a multi-level
7  approach to authenticating both existing and new customers and require their own
8  employees as well as third-party retailers to use it for all transactions."[41]  The FTC
9  also specifically warned carriers like AT&T of the risk that, due to text message
10  password reset requests and two-factor authentication, SIM swapping put
11  subscribers at risk of financial loss and privacy violations:

> Having a mobile phone account hijacked can waste hours of a
> victim's time and cause them to miss important calls and
> messages. However, this crime is particularly problematic due
> to the growing use of text messages to mobile phones as part of
> authentication schemes for financial services and other
> accounts. The security of two-factor authentication schemes
> that use phones as one of the factors relies on the assumption
> that someone who steals your password has not also stolen your
> phone number. *Thus, mobile carriers and third-party retailers*
> *need to be vigilant in their authentication practices to avoid*
> *putting their customers at risk of major financial loss and*
> *having email, social network, and other accounts*
> *compromised.*[42]

21      78.    AT&T admitted it was aware of SIM swap crimes and the effect they
22  could have on its customers in September 2017 when AT&T's Vice President of
23  Security Platforms published an article on AT&T's "Cyber Aware" blog about SIM

---

https://www.ftc.gov/news-events/blogs/techftc/2016/06/your-mobile-phone-account-could-be-hijacked-identity-thief (hereafter, "2017 FTC Report").
[39] *Id.*
[40] *Id.* (emphasis added).
[41] *Id.*
[42] *Id.* (emphasis added).

swaps.[43]  In the article, AT&T acknowledged that subscribers with "valuable accounts that are accessible online" are likely targets of SIM swaps.  AT&T recommended that its customers set up passcodes that would provide "extra security."  These passcodes failed to protect Mr. Ross.

79.     AT&T therefore knew that its customers' accounts were at risk for *longer than a year* before Mr. Ross' account was breached.

80.     AT&T's inadequate security procedures are particularly egregious in light of AT&T's repeated public statements about the importance of cyber security and its public representations about its expertise in this area.  AT&T has an entire series on its public YouTube channel ("AT&T ThreatTraq") dedicated to discussing and analyzing emerging cybersecurity threats.[44]  In its videos, AT&T describes itself as a "network that senses and mitigates cyber threats."[45]

81.     AT&T recognizes the risks that arise when a mobile phone is compromised, stating, "Our phones are mini-computers, and with so much personal data on our phones today, it's also important to secure our mobile devices."[46]  AT&T's advertisements also stress how central a role mobile phones play in its customer's lives, stating: "My phone is my life" and "My phone is everything."  The same ad stresses how the inability to use a mobile phone makes people feel "completely untethered, flailing around."[47]

82.     AT&T markets its ability to identify and neutralize emerging cyber threats for its customers.  In one video, AT&T employees discuss "threat hunting"

[43] Brian Rexroad, "Secure Your Number to Reduce SIM Swap Scams," AT&T's Cyber Aware (Sep. 2017), *available at* https://about.att.com/pages/cyberaware/ni/blog/sim_swap.
[44] "AT&T Tech Channel," YouTube, *available at* https://www.youtube.com/user/ATTTechChannel.
[45] "AT&T – Protect Your Network with the Power of &," VIMEO, *available at* https://vimeo.com/172399153.
[46] AT&T, "Mobile Security," YOUTUBE (Feb. 12, 2019), *available at* https://www.youtube.com/watch?v=KSPHS89VnX0.
[47] "AT&T Mobile Movement Campaign – Ads," VIMEO, *available at* https://vimeo.com/224936108.

1   – which they describe as "an active threat analysis where you're actually thinking

2   about your adversary."[48]  They claim that it's "important" and "something [AT&T

3   has] been doing for a long time."[49]  They advise that companies should think about

4   "what would a hacker want to do, where would a hacker go to get my data, what

5   are some of the points on my network that are most vulnerable, or where is the data

6   flow that is potentially going to be a leakage" and state that "having threat hunting

7   as part of a proactive continuous program, integrating with existing security

8   measures, will help [you] stay ahead of the threats."[50]  AT&T failed to heed this

9   advice.

10      83.    Not only did AT&T advise staying ahead of and addressing cyber

11  threats, it also stressed that these practices could even help identify "insider

12  threats"—*employees within the company.*

13      84.    In an additional video focused on insider threats, AT&T employees go

14  on at length about the threat of company insiders selling corporate information *and*

15  *access*, citing a survey showing that "30% [of respondents] had purposefully sent

16  data outside of their organization at some point in time" and "14% of the people

17  that were interviewed said they would actually sell their corporate log-ins to folks

18  on the outside or sell that data for less than about $250 US."[51]  They cited as a

19  "significant concern" the "individuals that have privileged access, that have broad

20  access inside an organization."[52]  AT&T therefore knew or should have known that

21  there was a significant risk that its own employees would provide AT&T customer

22  data—including customer account data—and that the risk was heightened when

23  employees had too broad of access to corporate systems, yet failed to put sufficient

24

25  _____

    [48] AT&T Tech Channel, "The Huntin' and Phishin' Episode," YOUTUBE (Apr. 21, 2017),

26  *available at* https://www.youtube.com/watch?v=3g9cPCiFosk.

    [49] *Id.*

27  [50] *Id.*

    [51] AT&T ThreatTraq, "The Real Threat of Insider Threats," YouTube (May 5, 2017), *available*

28  *at* https://www.youtube.com/watch?v=ZM5tuNiVsjs (emphasis added).

    [52] *Id.*

1   systems and resources in place to mitigate that risk, despite its own advice to the

2   contrary.

3       85.     AT&T has also recognized the danger presented to its customers when

4   their email addresses are hacked, as Mr. Ross' was as a result of AT&T's failures.

5   As one AT&T employee puts it: "I think most people do have something valuable

6   [in their email accounts], which is access to all their other accounts, which you can

7   get with a password reset."[53] They call this "something worth keeping safe."[54]

8   They advised that a "strong, obviously, security awareness program within a

9   company… is extremely important."[55]

10      86.     In this online video series, AT&T makes specific mention of SIM

11  swapping activity.  In one video, AT&T's Vice President of Security Platforms

12  (Brian Rexroad) and Principal of Technology Security (Matt Keyser) discuss the

13  hack of a forum called OGusers. [56]  In the segment, they discuss the hacking of

14  social media users' account names and point to a news story that highlights—in

15  distinct orange type—that OGusers is a forum popular among people "conducting

16  SIM swapping attacks to seize control over victims' phone numbers."[57]

17

18

19

20

21

22

23
_____

[53] *Id.*

24  [54] *Id. See also* "Account Hijacking Forum OGusers Hacked", KREBSONSECURITY (May 19,

25  2019), *available at* https://krebsonsecurity.com/2019/05/account-hijacking-forum-ogusers-
    hacked/

26  [55] *Id.*

27  [56] AT&T ThreatTraq, "5/31/19 Account-hacking Forum OGusers Hacked," YOUTUBE (May 31
    2019), *available at* https://www.youtube.com/watch?time_continue=234&v=cS4xV3cej3A.

28  [57] *Id.*; *see also* Freeman Indictment at ¶ 2 (Describing how "discussions—such as discussing the
    manner and means to [SIM swap] attacks generally, and networking among [SIM swap
    hackers]—typically took place on forums such as "OGusers.").



*Figure 2*

87.     AT&T was therefore well aware of the significant risk that AT&T employees and SIM swapping presented to its customers, and the need to mitigate such risks, but nonetheless failed to take adequate steps to protect Mr. Ross. Instead, it continued to make public statements giving rise to a reasonable expectation that AT&T could—and would—protect its customers.

88.     That Mr. Ross was at risk of account breaches at the hands of AT&T employees is particularly foreseeable—and AT&T's failures are particularly stark—in light of AT&T's history of unauthorized employee access to customer accounts.

89.     In 2015, AT&T faced an FCC enforcement action, and paid a $25 million civil penalty, for nearly identical failures to protect its customers' sensitive account data.[58]  In that case, as AT&T admitted, employees at an AT&T call center breached 280,000 customers' accounts.[59]  Specifically, AT&T employees had improperly used login credentials to access customer accounts and access customer

---

[58] *In the Matter of AT&T Servs., Inc.*, 30 F.C.C. Rcd. 2808 (2015).
[59] *Id.* at ¶ 1.

1    information that could be used to unlock the customers' devices.[60]  The employees

2    then sold the information they obtained from the breaches to a third party.[61]

3        90.    The FCC concluded that AT&T's "failure to reasonably secure

4    customers' proprietary information violates a carrier's statutory duty under the

5    Communications Act to protect that information, and also constitutes an unjust and

6    unreasonable practice in violation of the Act."[62]

7        91.    The FCC stressed that the FCA is intended to "ensure that consumers

8    can trust that carriers have taken appropriate steps to ensure that unauthorized

9    persons are not accessing, viewing or misusing their personal information."[63]  It

10   stressed its expectation that "telecommunications carriers such as AT&T… take

11   'every reasonable precaution' to protect their customers' data[.]"[64]

12       92.    As part of its penalty, AT&T entered into a stipulated Consent Decree

13   with the FCC, in which AT&T agreed to develop and implement a compliance plan

14   to ensure appropriate safeguards to protect consumers against similar breaches by

15   improving its privacy and data security practices.[65]

16       93.    This FCC enforcement action underscores AT&T's knowledge of the

17   risk its employees presented to customers, the prevalence of employee breaches to

18   customer data, the sensitive nature of customer CPNI, and its duties to protect and

19   safeguard that data.

20       94.    Nonetheless, more than 3 years after stipulating to the Consent

21   Decree, AT&T still failed to protect its customer from employee breaches of

22   customer CPNI and other account data, virtually identical to the breach at issue

23   here, heightening the degree of its negligence.

24

25   _____

26   [60] *Id.* at ¶¶ 7, 11.
     [61] *Id.* at ¶ 1.

27   [62] *Id.* at ¶ 2.
     [63] *Id.*

28   [64] *Id.*
     [65] *Id.* at ¶¶ 2, 17-18, 21.

1

**E.    AT&T is Liable for the Acts of its Employees**

2    95.    AT&T is liable for the acts of its employees, who facilitated the

3    unauthorized access to, and resulting theft from, Mr. Ross.

4    96.    AT&T failed to put in place adequate systems and procedures to

5    prevent the unauthorized employee access to Mr. Ross' account and related data.

6    AT&T failed to properly hire and supervise its employees, allowing them to access

7    Mr. Ross' sensitive and confidential account data without his authorization and

8    provide that data to third parties.

9    97.    In the context of AT&T's enterprise as a telecommunications carrier,

10    an employee accessing a customer's account information and effectuating a SIM

11    swap—even without authorization—is not so unusual or startling that it would be

12    unfair to include the loss resulting from such unauthorized access among other

13    costs of AT&T's business – particularly in light of AT&T's awareness of the risk of

14    SIM swaps to its customers.

15    98.    Further, imposing significant liability on AT&T may prevent

16    recurrence of SIM swap behavior because it creates a strong incentive for vigilance

17    and proper safeguarding of customers' data by AT&T—which, in the case of its

18    customers, is the sole party in the position to guard substantially against this

19    activity, as it is the custodian and guardian of this data.

20    99.    As a customer of AT&T, Mr. Ross is entitled to rely upon the

21    presumption that AT&T and the agents entrusted with the performance of AT&T's

22    business have faithfully and honestly discharged the duty owed to him by AT&T,

23    and that they would not gain unauthorized access to his account.

24    100.    The reasonableness of Mr. Ross' expectations that AT&T would

25    safeguard his data is confirmed by the fact that the federal agency responsible for

26    overseeing AT&T's duties to its customers, the FCC, has stated that it "fully

27

28

1   expect[s] carriers to take every reasonable precaution to protect the confidentiality

2   of proprietary or personal customer information."[66]

3   **F.      AT&T's Misrepresentations and Omissions.**

4        101.   AT&T's Privacy Policy, and the "Privacy Commitments" included

5   therein, falsely represents and fails to disclose material information about its data

6   security practices.

7        102.   In its Privacy Policy, AT&T promised to protect Mr. Ross' privacy and

8   personal information, including by using "security safeguards."  AT&T further

9   pledges that it will not sell customer data.

10       103.   These representations created an expectation that Mr. Ross' AT&T

11  account and associated data would be safe and secure, that employees would not

12  access his account without authorization, that his data would be protected from

13  unauthorized disclosure, and that he could control how and when his data was

14  accessed.  Figure 3, immediately below, is an excerpt from AT&T's Privacy Policy.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[66] 2007 CPNI Order ¶ 64.

# Our Privacy Commitments

**Our privacy commitments are fundamental to the way we do business every day. These apply to everyone who has a relationship with us - including customers (wireless, Internet, digital TV, and telephone) and Web site visitors.**

- We will protect your privacy and keep your personal information safe. We use encryption and other security safeguards to protect customer data.
- We will not sell your personal information to anyone, for any purpose. Period.
- We will fully disclose our privacy policy in plain language, and make our policy easily accessible to you.
- We will notify you of revisions to our privacy policy, in advance. No surprises.
- You have choices about how AT&T uses your information for marketing purposes. Customers are in control.
- We want to hear from you. You can send us questions or feedback on our privacy policy.

*Figure 3*[67]

104.   AT&T's representation that it "uses encryption and other security safeguards to protect customer data" is false and extremely misleading.

105.   As alleged fully above, AT&T allowed its employees to access Mr. Ross' account, and the CPNI and other sensitive data contained therein, without his authorization.  AT&T's statement that it would use encryption and other security safeguards to protect customers' data is therefore a material misrepresentation.

106.   Upon information and belief, AT&T's security safeguards were inadequate, including its system which—upon information and belief—allowed an individual employee to conduct SIM swaps without adequate oversight, even when that employee authorizes a COAM SIM swap over the phone in violation of company policy.

---

[67] "Privacy Policy," AT&T, attached hereto as Exhibit C.

107.   "Having one employee who can conduct these SIM swaps without any kind of oversight seems to be the real problem," says Lieutenant John Rose, a member of the California-based Regional Enforcement Allied Computer Team ("REACT"), a multi-jurisdictional law enforcement partnership specializing in cybercrime.[68] "And it seems like [the carriers] could really put a stop to it if there were more checks and balances to prevent that. It's still very, very easy to SIM swap, and something has to be done because it's just too simple. Someone needs to light a fire under some folks to get these protections put in place."

108.   AT&T failed to put in place adequate systems and procedures to prevent the unauthorized employee access to and sale of Mr. Ross' account and related data.  In connection with subsequent criminal investigations into Mr. Ross' SIM swap, AT&T informed law enforcement that it had the capacity to see how many different SIM cards had been associated with the same single mobile phone's IMEI.[69]  In other words, AT&T could see when one mobile phone had multiple SIM cards associated with it in a short amount of time.[70]

109.   AT&T also informed law enforcement that the hacker involved in Mr. Ross' SIM swap had requested that *eleven different phone numbers* be moved onto his phone (identified by its IMEI number) in the twenty-one days before Mr. Ross' swap.[71]  The hacker sometimes moved three different AT&T numbers onto the same phone *in a single day*.[72]  AT&T certainly had the capability to see this behavior, and could and should have flagged it as suspicious.  If AT&T had proper security safeguards in place, it would have recognized this behavior, flagged it as suspicious, and prevented any further SIM swaps onto that phone – thereby protecting Mr. Ross.

---

[68] Busting SIM Swappers and SIM Swap Myths," KREBSONSECURITY (Nov. 18, 2018), *available at https://krebsonsecurity.com/2018/11/busting-sim-swappers-and-sim-swap-myths*.
[69] Ex. B. at pp. 8, 22.
[70] *Id.*
[71] *Id.*
[72] *Id.* at 22.

110.   Additionally, as alleged fully above, AT&T failed to establish a consent mechanism that verified proper authorization before Mr. Ross' data was accessed and provided to third parties.  AT&T's statement that it would use encryption and other security safeguards to protect customers' data is therefore a material misrepresentation.

111.   AT&T's representation that it "will protect [customers'] privacy and keep [their] personal information safe" is false and misleading.

112.   As alleged fully above, AT&T failed to establish a consent mechanism that verified proper authorization before Mr. Ross' account and the data therein were accessed and used without his authorization or consent and disclosed to third parties.  Mr. Ross' privacy and personal information was not safe, as demonstrated by the breach of his AT&T account.  AT&T's statement that it would protect customers' privacy and keep their personal information safe is therefore a material misrepresentation.

113.   AT&T also makes numerous false or misleading representations concerning its treatment of customers' data that qualifies as CPNI under the FCA.

114.   AT&T explicitly and falsely represents in its Privacy Policy that it does not "sell, trade or share" their CPNI:

> We do not sell, trade or share your CPNI with anyone
> outside of the AT&T family of companies* or our
> authorized agents, unless required by law (example: a
> court order).[73]

115.   As alleged fully above, AT&T provided access to Mr. Ross' CPNI to third-party hackers.  This use was not required by law and was instead *prohibited* by law.

---

[73] "Customer Proprietary Network Information (CPNI)," AT&T, Ex. C at 31-32.  The "AT&T family of companies" is defined as "those companies that provide voice, video and broadband-related products and/or services domestically and internationally, including the AT&T local and long distance companies, AT&T Corp., AT&T Mobility, DIRECTV, and other subsidiaries or affiliates of AT&T Inc. that provide, design, market, or sell these products and/or services."  *Id.*

116.   AT&T also states that it only uses CPNI "internally" and its *only* disclosed use of CPNI is "among the AT&T companies and our agents in order to offer you new or enhanced services."[74]

117.   AT&T employees' use of Mr. Ross' account and related data as described herein was not for "internal" AT&T purposes, nor was it used to market AT&T services.  AT&T's statements regarding the use of customer CPNI are therefore material misrepresentations.  Its failure to disclose this is a material omission.

118.   AT&T also falsely represents that it "uses technology and security features, and strict policy guidelines with ourselves and our agents, to safeguard the privacy of CPNI."

119.   As alleged fully above, AT&T and its agents failed to safeguard Mr. Ross' CPNI.  Instead, it stored customer CPNI in such a way that unauthorized access was easily obtained by employees and third parties.  AT&T's statements regarding the technology and security features it uses to safeguard customer CPNI are therefore material misrepresentations.

120.   AT&T was obligated to disclose the weaknesses and failures of its account and data security practices, as AT&T had exclusive knowledge of material facts not known or knowable to its customers, AT&T actively concealed these material facts from Mr. Ross, and such disclosures were necessary to materially qualify its representations that it took measures to protect consumer data and to materially qualify its partial disclosures concerning its use of customers' CPNI.  Further, AT&T was obligated to disclose its practices under the FCA.

121.   A reasonable person would be deceived and misled by AT&T's misrepresentations, which clearly indicated that AT&T would safeguard its customers' personal information and CPNI.

---

[74] *Id.*

122.   AT&T intentionally misled Mr. Ross regarding its data security practices in order to maintain his business, make money from his account, and evade prosecution for its unlawful acts.

123.   AT&T's representations that it protected customers' personal information, when in fact it did not, were false, deceptive, and misleading and therefore a violation of the FCA.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### Violations of The Federal Communications Act, 47 U.S.C. § 201 *et seq.*

124.   Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

125.   AT&T has violated 47 U.S.C. § 222(a) by failing to protect the confidentiality of Mr. Ross' CPNI, as detailed herein.

126.   AT&T has violated 47 U.S.C. § 222(c) by using, disclosing, and/or permitting access to Mr. Ross' CPNI without the notice, consent, and/or legal authorization required under the FCA, as detailed herein.  AT&T also caused and/or permitted third parties to use, disclose, and/or permit access to Mr. Ross' CPNI without the notice, consent, and/or legal authorization required under the FCA, as detailed herein.

127.   As fully alleged above, Mr. Ross has suffered injury to his person, property, health, and reputation as a consequence of AT&T's violations of the FCA.  Additionally, Mr. Ross has suffered emotional damages, including severe anxiety and depression, mental anguish, and suffering as a result of AT&T's acts and practices. These emotional damages have led directly to physical issues; for example, Mr. Ross began stress-eating which resulted in Mr. Ross gaining approximately 40 pounds in only a few months following the AT&T-facilitated thefts.

128.   Mr. Ross seeks the full amount of damages sustained as a consequence of AT&T's violations of the FCA, together with reasonable attorneys'

1   fees, to be fixed by the Court and taxed and collected as part of the costs of the

2   case.  Mr. Ross also moves for a writ of injunction or other proper process,

3   mandatory or otherwise, to restrain Defendant AT&T and its officers, agents, or

4   representatives from further disobedience of the 2007 and 2013 CPNI Orders, or to

5   compel their obedience to the same.

6                                    **COUNT II**
7        **Violations of The California Unfair Competition Law ("UCL")
         under the Unlawful, Unfair and Fraudulent Prongs,**
8        **California Business & Professional Code § 17200 *et seq*.**

9          129.   Plaintiff Robert Ross realleges and incorporates all of the preceding

10  paragraphs as though fully set forth in this cause of action.

11         130.   California's Unfair Competition Law (UCL) prohibits any "unlawful,

12  unfair or fraudulent business act or practice."  AT&T's business acts and practices

13  complained of herein were unlawful, unfair, and fraudulent.

14         131.   AT&T made material misrepresentations and omissions concerning its

15  safeguarding of Mr. Ross' CPNI.  As alleged fully above, a reasonable person

16  would attach importance to the privacy of his sensitive account data in determining

17  whether to contract with a mobile phone provider.

18         132.   AT&T had a duty to disclose the nature of its inadequate security

19  practices and failures in hiring, training, and supervising staff.  AT&T had

20  exclusive knowledge of material facts not known or knowable to its customers and

21  AT&T actively concealed these material facts from its customers.

22         133.   Further, additional disclosures were necessary to materially qualify

23  AT&T's representations that it did not sell consumer data and took measures to

24  protect that data, and its partial disclosures concerning its use of customers' CPNI.

25  AT&T was obligated to disclose its practices, as required by the FCA.  The

26  magnitude of the harm suffered by Mr. Ross underscores the materiality of AT&T's

27  omissions.

28

134.   A reasonable person, such as Mr. Ross, would be deceived and misled by AT&T's misrepresentations, which indicated that AT&T would safeguard its customers' personal and proprietary information.

135.   AT&T intentionally misled its customers regarding its data protection practices in order to attract customers and evade prosecution for its unlawful acts.

136.   AT&T's actions detailed herein constitute an unlawful business act or practice.  As alleged herein, AT&T's conduct is a violation of the California constitutional right to privacy, the FCA, and the CLRA.

137.   AT&T's actions detailed herein constitute an unfair business act or practice.

138.   AT&T's conduct lacks reasonable and legitimate justification in that Mr. Ross has been misled as to the nature and integrity of AT&T's goods and services and has suffered injury as a result.

139.   The gravity of the harm caused by AT&T's practices far outweigh the utility of AT&T's conduct.  AT&T's practices were contrary to the letter and spirit of the FCA and its corresponding regulations, which require mobile carriers to disclose customers' CPNI only upon proper notice, consent, and authorization, and aims to vest carrier customers with control over their data.  Due to the surreptitious nature of AT&T's actions, Mr. Ross could not have reasonably avoided the harms incurred as a result.

140.   As the FCA establishes, it is against public policy to allow carrier employees or other third parties to access, use, or disclose telecommunications customers' sensitive account information.  The effects of AT&T's conduct are comparable to or the same as a violation of the FCA.

141.   AT&T's actions detailed herein constitute a fraudulent business act or practice.

142.   As established herein, Mr. Ross has suffered injury in fact and economic harm as a result of AT&T's unfair competition.  Additionally, had AT&T

1    disclosed the true nature and extent of its data security and protection practices—

2    and the flaws inherent in its systems—and its unwillingness to properly protect its

3    customers, Mr. Ross would not have subscribed to or paid as much money for

4    AT&T's mobile services.

5        143.   Mr. Ross seeks injunctive and declaratory relief for AT&T's violations

6    of the UCL.  Mr. Ross seeks public injunctive relief against AT&T's unfair and

7    unlawful practices in order to protect the public and restore to the parties in interest

8    money or property taken as a result of AT&T's unfair competition.  Mr. Ross seeks

9    a mandatory cessation of AT&T's practices, and proper safeguarding of AT&T

10   account data.

### COUNT III
### Violations of the California Constitutional Right to Privacy

11

12       144.   Plaintiff Robert Ross realleges and incorporates all of the preceding

13   paragraphs as though fully set forth in this cause of action.

14       145.   The California Constitution declares that, "All people are by nature

15   free and independent and have inalienable rights. Among these are enjoying and

16   defending life and liberty, acquiring, possessing, and protecting property, and

17   pursuing and obtaining safety, happiness, and privacy."  Cal. Const. Art. I, § 1.

18       146.   Mr. Ross has a reasonable expectation of privacy in his mobile device

19   and his AT&T account information.

20       147.   AT&T intentionally intruded on and into Mr. Ross' solitude, seclusion,

21   or private affairs by allowing its employees and third parties to improperly access

22   Mr. Ross' confidential AT&T account information without proper consent or

23   authority.

24       148.   The reasonableness of Mr. Ross' expectations of privacy is supported

25   by AT&T and its agents' unique position to safeguard his account data, including

26   the sensitive and confidential information contained therein, and protect Mr. Ross

27   from SIM swap attacks.

28

149.   AT&T and its agents' intrusions into Mr. Ross' privacy are highly offensive to a reasonable person.  This is evidenced by federal legislation enacted by Congress and rules promulgated and enforcement actions undertaken by the FCC aimed at protecting AT&T customers' sensitive account data from unauthorized use or access.

150.   The offensiveness of AT&T's conduct is heightened by its material misrepresentations to Mr. Ross concerning the safety and security of his account.

151.   Mr. Ross suffered great personal and financial harm by the intrusion into his private affairs, as detailed throughout this Complaint.

152.   AT&T's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Mr. Ross.  But for AT&T employees' unauthorized access to Mr. Ross' account and AT&T's failure to protect Mr. Ross from such harm through adequate security and oversight systems and procedures, Mr. Ross would not have had his personal privacy repeatedly violated and would not have been a victim of SIM swap theft.

153.   As a result of AT&T's actions, Mr. Ross seeks nominal and punitive damages in an amount to be determined at trial.  Mr. Ross seeks punitive damages because AT&T's actions were malicious, oppressive, and willful.  AT&T knew or should have known about the risks faced by Mr. Ross, and the grave consequences of such risks.  Nonetheless, AT&T utterly failed to protect Mr. Shapiro – instead allowing its employees to profit to his detriment.  Punitive damages are warranted to deter AT&T from engaging in future misconduct.

### COUNT IV
### Negligence

154.   Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

155.   AT&T owed a duty to Mr. Ross—arising from the sensitivity of his AT&T account information and the foreseeability of harm to Mr. Ross should

1    AT&T fail to safeguard and protect such data—to exercise reasonable care in
2    safeguarding his sensitive personal information.  This duty included, among other
3    things, designing, maintaining, monitoring, and testing AT&T's and its agents',
4    partners', and independent contractors' systems, protocols, and practices to ensure
5    that Mr. Ross' information was adequately secured from unauthorized access.

6        156.   Federal law and regulations, as well as AT&T's privacy policy,
7    acknowledge AT&T's duty to adequately protect Mr. Ross' confidential account
8    information.

9        157.   AT&T owed a duty to Mr. Ross to protect his sensitive account data
10   from unauthorized use, access, or disclosure.  This included a duty to ensure that
11   his CPNI was used, accessed, or disclosed only with proper consent.

12       158.   AT&T owed a duty to Mr. Ross to implement a system to safeguard
13   against and detect unauthorized access to Mr. Ross' AT&T data in a timely manner.

14       159.   AT&T owed a duty to Mr. Ross to disclose the material fact that its
15   data security practices were inadequate to safeguard Mr. Ross' AT&T account data
16   from unauthorized access by its own employees and others.

17       160.   AT&T had a special relationship with Mr. Ross due to its status as his
18   telecommunications carrier, which provided an independent duty of care.  AT&T
19   had the unique ability to protect its systems and the data it stored thereon from
20   unauthorized access.

21       161.   Mr. Ross' willingness to contract with AT&T, and thereby entrust
22   AT&T with his confidential and sensitive account data, was predicated on the
23   understanding that AT&T would undertake adequate security and consent
24   precautions.

25       162.   AT&T breached its duties by, *inter alia*: (a) failing to implement and
26   maintain adequate security practices to safeguard Mr. Ross' AT&T account and
27   data—including his CPNI—from unauthorized access, as detailed herein; (b)
28   failing to detect unauthorized accesses in a timely manner; (c) failing to disclose

1   that AT&T's data security practices were inadequate to safeguard Mr. Ross' data;

2   (d) failing to supervise its employees and prevent employees from accessing and

3   utilizing Mr. Ross' AT&T account and data without authorization; and (e) failing to

4   provide adequate and timely notice of unauthorized access.

5       163.   AT&T was also negligent in its authorization of Mr. Ross' SIM card

6   swap.  AT&T knew or should have known that at least ten different AT&T numbers

7   had been moved to the same mobile phone (identified by its IMEI) in the days

8   leading up to Mr. Ross' SIM swap.  AT&T knew or should have known that this

9   was highly suspicious.  Nevertheless, AT&T effectuated the transfer of Mr. Ross'

10   AT&T account to this same mobile phone.  AT&T had the technical capacity to

11   track this behavior—as reflected in its willingness to do so for law enforcement—

12   but nonetheless failed to utilize it for the benefit and protection of Mr. Ross.

13       164.   But for AT&T's breaches of its duties, Mr. Ross' data would not have

14   been accessed by unauthorized individuals.

15       165.   Mr. Ross was a foreseeable victim of AT&T's inadequate data security

16   practices and consent mechanisms.  As alleged fully above, AT&T knew or should

17   have known that SIM swaps presented a serious threat to its customers, including

18   Mr. Ross, before Mr. Ross' account was breached for the first time.  AT&T also

19   knew or should have known that improper procedures and systems to safeguard

20   customer data could allow its employees to authorize customers' accounts and data,

21   as occurred in the 2015 FCC enforcement action.

22       166.   AT&T knew or should have known that unauthorized access would

23   cause damage to Mr. Ross.  AT&T admitted that unauthorized account access

24   presents a significant threat to its customers, and it became aware during its 2015

25   FCC enforcement action of the harms caused by unauthorized account access.

26       167.   AT&T's negligent conduct provided a means for unauthorized

27   individuals to access Mr. Ross' AT&T account data, take over control of his mobile

28

phone, and use such access to hack into numerous online accounts in order to rob Mr. Ross and steal his personal information.

168.   As a result of AT&T's failure to prevent unauthorized accesses, Mr. Ross suffered grave injury, as alleged fully above, including severe emotional distress.  This emotional distress arose out of AT&T's breach of its legal duties. The damages Mr. Ross suffered were a proximate, reasonably foreseeable result of AT&T's breaches of its duties.

169.   Therefore, Mr. Ross is entitled to damages in an amount to be proven at trial.

## COUNT V
### Negligent Supervision and Entrustment

170.   Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

171.   AT&T conducts its business activities through employees or other agents, including AT&T contract attorneys.

172.   AT&T is liable for harm resulting from its agents' and employees' because AT&T was reckless or negligent in employing and/or entrusting employees in work involving the risk of harm to others, including Mr. Ross.

173.   On information and belief, AT&T knew or had reason to believe that its employees were unfit and failed to exercise reasonable care in properly investigating and overseeing them.  AT&T was negligent in supervising these employees and in entrusting them with what it knew to be highly sensitive confidential information.  AT&T knew or had reason to know that its employees were likely to harm others in view of the work AT&T entrusted to them. Specifically, AT&T entrusted its employees with the responsibility to conduct SIM card changes without sufficient oversight – as demonstrated by an AT&T employee effectuating the October 2018 SIM swap on Mr. Ross' account despite AT&T's policy disallowing COAM SIM changes over the phone.

174.   Additionally, as alleged fully above, the hacker involved in Mr. Ross' SIM swap had associated numerous different SIM cards with the same device IMEI in the days leading up to Mr. Ross' attack.  Despite the highly suspicious nature of this activity, and AT&T's ability to track such requests, AT&T failed to put any additional protections on customer accounts to prevent its employees from approving additional SIM swaps to the same IMEI.

175.   Upon information and belief, AT&T failed to exercise due care in selecting its employees, and thereby negligently or recklessly employed employees to do acts—including accessing customer accounts and effectuating SIM swaps—which necessarily brought them in contact with others, including Mr. Ross, while in the performance of those duties.

176.   AT&T's acts, as alleged herein, were negligent in that they created the risk of unauthorized account access, SIM card changes, and the damages resulting therefrom.

177.   AT&T also failed to properly supervise its employees, and instead continued to negligently entrust them with sensitive customer data.  On information and belief, had AT&T fired the involved AT&T employee or employees when they first began to exhibit suspicious SIM swap activity— including but not limited to approving SIM changes that violated AT&T policy— Mr. Ross would not have been injured.

178.   On information and belief, had AT&T built a system to effectively authenticate and verify consumer consent before allowing employees to access their CPNI—as required by the FCA—Mr. Ross would not have been injured.

179.   On information and belief, had AT&T prevented individual employees from unilaterally performing SIM swaps without proper oversight, Mr. Ross would not have been injured.

180.   In sum, AT&T gave its employees the tools and opportunities they needed to gain unauthorized access to Mr. Ross' account and failed to prevent

1    them from doing so, thereby allowing them to use AT&T's systems to perpetuate

2    privacy breaches and thefts against Mr. Ross.

3        181.   The involved AT&T employee(s') actions have a causal nexus to their

4    employment.  Mr. Ross' injuries arose out of his contract with AT&T as his

5    carrier, and AT&T's access to his CPNI and account data as a result.  The risk of

6    injury to Mr. Ross was inherent in the AT&T working environment.

7        182.   Mr. Ross' injury was also foreseeable.  As alleged fully above, AT&T

8    was aware of the risks that SIM swaps presented to their customers.  AT&T was

9    also aware that its customers' accounts were vulnerable to unauthorized access by

10   its employees, as demonstrated in the 2015 FCC enforcement action. Furthermore,

11   Mr. Ross' injury was foreseeable as AT&T could have and should have seen that

12   the same hacker phone had been used in multiple previous unauthorized SIM

13   swaps.

14                              **COUNT VI**

15   **Violations of California's Consumers Legal Remedies Act ("CLRA"),**
     **California Civil Code § 1750 *et seq.***

16       183.   Plaintiff Robert Ross realleges and incorporates all of the preceding

17   paragraphs as though fully set forth in this cause of action.

18       184.   Through his counsel, Mr. Ross sent AT&T two letters via certified

19   mail on August 9, 2019 and September 13, 2019. These letters identified the

20   violations Mr. Ross planned to allege against AT&T under the CLRA.  In response

21   to these letters, AT&T did not provide any meaningful settlement offer to Mr. Ross.

22       185.   As an AT&T customer, Mr. Ross engaged in transactions with AT&T

23   concerning his mobile service.  Mr. Ross sought and acquired services from AT&T

24   for his personal, family and household purposes.

25       186.   AT&T has engaged in unfair methods of competition and unfair or

26   deceptive acts or practices intended to result and which did result in the sale of

27   mobile services to Mr. Ross, as detailed herein.

28

187.   AT&T's acts and representations concerning the safeguards it employs to protect consumer account data—including Mr. Ross' data—is likely to mislead reasonable consumers, including Mr. Ross, as detailed herein.

188.   AT&T has represented that its goods or services have characteristic and/or benefits that they do not have.  Specifically, AT&T represented that, in purchasing AT&T mobile service and using AT&T-compatible phones, Mr. Ross' confidential data would be safeguarded and protected as alleged fully above.

189.   In actuality, as alleged fully above, AT&T's mobile service did not protect and/or safeguard Mr. Ross' data from unauthorized access, and AT&T's employees did in fact obtain unauthorized access to customers' personal information, as detailed herein.

190.   AT&T's misrepresentations and omissions concerning its safeguarding of customers' account data were materially misleading.  As alleged fully above, a reasonable person would attach importance to the privacy of his sensitive account data in determining whether to contract with a mobile phone provider.

191.   AT&T was obligated to disclose the shortcomings of its data protection practices, as AT&T had exclusive knowledge of material facts not known or knowable to its customers, AT&T actively concealed these material facts from its customers, and such disclosures were necessary to materially qualify its representations that it took measures to protect consumer data and its partial disclosures concerning its use of customers' CPNI.  Further admissions were necessary to prevent AT&T's statements from misleading the public in light of the undisclosed facts concerning its security procedures.

192.   Further, AT&T was obligated to disclose its practices—by seeking consent beforehand or informing customers of breaches in the aftermath—under the FCA.

193.   AT&T's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Mr. Ross, as alleged fully above.

194.   Mr. Ross seeks injunctive relief, damages—including actual, statutory, and punitive damages—and attorneys' fees for AT&T's violations of the CLRA. He seeks public injunctive relief against AT&T's unfair and unlawful practices in order to protect the public and restore to the parties in interest money or property taken as a result of AT&T's unfair methods of competition and unfair or deceptive acts or practices.  Mr. Ross seeks a mandatory cessation of AT&T's practices and proper safeguarding of confidential customer account data.

**COUNT VII**
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

195.   Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

196.   Mr. Ross' mobile device is capable of connecting to the Internet.

197.   AT&T employees, in the scope of their employment, intentionally accessed Mr. Ross' mobile device, and assisted others in accessing his mobile device, without Mr. Ross' authorization, in order to assist hackers in their theft of Mr. Ross.

198.   The AT&T employees took these actions knowing that they would cause damage to Mr. Ross' mobile device, as well as damage to the information located on his mobile device.

199.   The AT&T employees caused Mr. Ross' mobile device and much of the data on it to be unusable to him.

200.   Because of the AT&T employees' actions, Mr. Ross suffered damage to his mobile device and damage to information on his mobile device, including being unable to access information and data on his mobile device and being unable to access his personal accounts, including his personal (e.g. G-mail) and financial (e.g. cryptocurrency and PayPal) accounts.

1       201.   The act of swapping Mr. Ross' AT&T mobile SIM card was in the

2  scope of the AT&T employees' work.

3       202.   Further, Mr. Ross spent in excess of $5,000 investigating who

4  accessed his mobile device and damaged information on it.

5  **VII.  PRAYER FOR RELIEF**

6       203.   WHEREFORE, Plaintiff Robert Ross requests that judgment be

7  entered against Defendant and that the Court grant the following:

8      A.    Judgment against Defendant for Plaintiff's asserted causes of action;

9      B.    Public injunctive relief requiring cessation of Defendant's acts and

10            practices complained of herein pursuant to, *inter alia*, Cal. Bus. &

11            Prof. Code § 17200, 47 U.S.C. § 401(b), and Cal. Civ Code § 1780;

12      C.    Pre- and post-judgment interest, as allowed by law;

13      D.    An award of monetary damages, including punitive damages, as

14            allowed by law;

15      E.    Reasonable attorneys' fees and costs reasonably incurred, including

16            but not limited to attorneys' fees and costs pursuant to 47 U.S.C. §

17            206; and

18      F.    Any and all other and further relief to which Plaintiff may be entitled.

19                    **<u>DEMAND FOR JURY TRIAL</u>**

20   Plaintiff demands a trial by jury of all issues so triable.

21

22

23

24

25

26

27

28

1     Dated: October 17, 2019          Respectfully submitted,

2

3                                       /s/ Thomas D. Warren

                                 Thomas D. Warren (SBN 160921)

4                                  twarren@piercebainbridge.com

                                 Andrew Calderón (SBN 316673)

5                                  acalderon@piercebainbridge.com

6                                  **PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

7                                  355 S. Grand Avenue, 44th Floor,

                                 Los Angeles, CA 90071

8                                  Telephone: (213) 262-9333

                                 Facsimile: (213) 279-2008

9

10                                  Dwayne D. Sam (*pro hac application forthcoming*)

11                                  dsam@piercebainbridge.com

12                                  **PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

13                                  600 Pennsylvania Avenue NW

14                                  South Tower, Suite 700

                                 Washington, DC 20004

15                                  Telephone: (202) 843-8342

16                                  Facsimile: (646) 968-4125

17

18

19

20

21

22

23

24

25

26

27

28