**EXHIBIT 2**



CHRISTOPHER GRIVAKES
 cg@agzlaw.com
DAMION ROBINSON
 dr@agzlaw.com
AFFELD GRIVAKES LLP
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone:  310.979.8700
Facsimile: 310.979.8701

Attorneys for Plaintiff ROBERT ROSS

*Counsel for Plaintiff Robert Ross*

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ROSS, | Case No. 3:19-cv-6669 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| AT&T MOBILITY, LLC, ONE TOUCH DIRECT, LLC, and ONE TOUCH DIRECT- SAN ANTONIO, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

CIVIL FIRST AMENDED COMPLAINT

**Formatted:** Font: 14 pt

**Formatted:** Right:  0"

I.      NATURE OF THE ACTION

1.      This action arises out of AT&T's failure to protect the sensitive and confidential account data of its mobile service subscriber, Robert Ross, resulting in massive violations of Mr. Ross's privacy, the compromise of his highly sensitive personal and financial information, and the theft of more than $1 million.

2.      AT&T is the country's largest mobile service provider.  Tens of millions of subscribers entrust AT&T with access to their confidential information, including information that can serve as a key to unlock subscribers' highly sensitive personal and financial information.

3.      Recognizing the harms that arise when mobile subscribers' personal information is accessed, disclosed, or used without their consent, federal and state laws require AT&T to protect this sensitive information.

4.      AT&T also recognizes the sensitivity of this data and promises its 150 million mobile subscribers that it will safeguard their private information – and particularly their data-rich SIM cards – from any unauthorized disclosure. AT&T promises it "will protect [customers'] privacy and keep [their] personal information safe" and that it "will not sell [customers'] personal information to anyone, for any purpose. Period."  AT&T repeatedly broke these promises.

5.      In an egregious violation of the law and its own promises, and despite advertising itself as a leader in technological development and as a cyber security-savvy company, AT&T breached its duty and promise to Mr. Ross to protect his account and the sensitive data it contained.  AT&T failed to implement sufficient data security systems and procedures, instead allowing third parties to gain unauthorized access to Mr. Ross's AT&T account in order to steal from him.

6.      AT&T's actions and conduct were a substantial factor in causing significant financial and emotional harm to Mr. Ross and his family.  But for AT&T employees', representatives' and agents' unauthorized access to Mr. Ross' account, and AT&T's failure to protect Mr. Ross through adequate security and oversight

– 1 –

1     systems and procedures, Mr. Ross would not have had his personal privacy

2     repeatedly violated and would not have been a victim of SIM swap theft.

3          7.     Mr. Ross brings this action to hold AT&T accountable for its

4     violations of federal and state law, and to recover for the grave financial and

5     personal harm suffered by Mr. Ross and his family as a direct result of AT&T's acts

6     and omissions, as detailed herein.

7     **II.**     **THE PARTIES**

8          8.     Plaintiff Robert Ross is, and at all relevant times was, a resident of

9     California. Mr. Ross currently resides in San Francisco, California.

10          9.     Mr. Ross was an AT&T mobile customer at all times relevant to this

11     Complaint. He purchased a mobile phone plan from AT&T in San Francisco,

12     California in 2007 for personal use, was an active, paying AT&T mobile subscriber

13     at all times relevant to the allegations in this Complaint, and his business

14     relationship was directly with AT&T at all relevant times.

15          10.     Defendant AT&T Mobility, LLC (hereinafter, "AT&T") is a Delaware

16     limited liability corporation with its principal office or place of business in

17     Brookhaven, Georgia. AT&T "provides nationwide wireless services to consumers

18     and wholesale and resale wireless subscribers located in the United States or U.S.

19     territories" and transacts or has transacted business in this District and throughout

20     the United States. It is the second largest wireless carrier in the United States, with

21     more than 153 million subscribers, earning $71 billion in total operating revenues

22     in 2017 and $71 billion in 2018. As of December 2017, AT&T had 1,470 retail

23     locations in California.OF[1]

24          11.     AT&T provides wireless service to subscribers in the United States.

25     AT&T is a "common carrier" governed by the Federal Communications Act

26     ("FCA"), 47 U.S.C. § 151 *et seq.* AT&T is regulated by the Federal

27

28     [1] "About Us," AT&T, *available at* https://engage.att.com/california/about-us/. All URLs in this complaint were last accessed on October 15, 2019.

1    Communications Commission ("FCC") for its acts and practices, including those

2    occurring in this District.

3        12.    AT&T Inc., AT&T's parent company, acknowledged in its 2018

4    Annual Report that its "profits and cash flow are largely driven by [its] Mobility

5    business" and "nearly half of [the] company's EBITDA (earnings before interest,

6    taxes, depreciation and amortization) come from Mobility."[2]

7        13.    Defendant One Touch Direct, LLC ("One-Touch Direct") is a Florida

8    Corporation with its principal place of business in Tampa, Florida.  Plaintiff is

9    informed and believes and thereon alleges that AT&T contracted with One-Touch

10   Direct to provide call center services for AT&T's mobile phone customers.

11       14.    Defendant One Touch Direct - San Antonio, LLC ("One-Touch

12   Direct-SA") is a Florida Corporation with its principal place of business in Tampa,

13   Florida.  Plaintiff is informed and believes and thereon alleges that One-Touch

14   Direct-SA is a subsidiary of One Touch Direct - SA and the employer of the

15   customer service representative(s) who executed the remote SIM swap on

16   Plaintiff's mobile phone.

17       15.    At all relevant times, One Touch Direct and One Touch Direct-SA

18   were AT&T's authorized representatives and agents and performed services for

19   AT&T which were within the usual course of AT&T's business.

20       16.    At all relevant times, AT&T dictated and controlled the manner and

21   means by which One Touch Direct and One Touch Direct-SA performed their

22   services for AT&T.   On information and belief, AT&T entered into a master

23   service agreement with One Touch Direct which governed the terms and condition

24   of AT&T's relationship with One Touch Direct and its subsidiaries such as One

25   Touch Direct-SA, and which required the One Touch entities to strictly adhere to

26   AT&T's guidelines,  protocols, policies, and procedures relating to customer

27

28   _____

[2] *Id.*

– 3 –

1  service, including those relating to SIM swaps.  Furthermore, AT&T controlled the

2  security measures it implemented across its entire network operation (including its

3  own call centers and third--party call centers), as well as the data accumulated

4  across the entire network, to monitor, detect and prevent unauthorized SIM swaps.

5      17.   At all relevant times, One Touch Direct and One Touch Direct-SA

6  employees identified themselves to Mr. Ross as "AT&T" rather than One Touch

7  Direct (at AT&T's direction), had full access to and use of the AT&T customer

8  database which enabled them to perform customer service functions (including

9  SIM swaps), did not disclose that they were employed by One Touch Direct, and

10  were in essence *de facto* employees of AT&T.

11  12.

12  **III.    JURISDICTION AND VENUE**

13      13.18. This Court has jurisdiction over this matter under 28 U.S.C. § 1331

14  because this case arises under federal question jurisdiction under the Federal

15  Communications Act ("FCA").  The Court has supplemental jurisdiction under 28

16  U.S.C. § 1367 over the state law claims because the claims are derived from a

17  common nucleus of operative facts.  The Court also has jurisdiction over this

18  action pursuant to 28 U.S.C. § 1332 because Mr. Ross is a citizen of a different

19  state than AT&T, One Touch Direct, and One Touch Direct-SA.

20      14.19. This Court has personal jurisdiction over AT&T and its contractors

21  One Touch Direct and One Touch Direct-SA because AT&T purposefully directs its

22  conduct at California, transacts substantial business in California (including in this

23  District), has substantial aggregate contacts with California (including in this

24  District), engaged and is engaging in conduct that has and had a direct, substantial,

25  reasonably foreseeable, and intended effect of causing injury to persons in

26  California (including in this District), and purposely avails itself of the laws of

27  California.  AT&T had more than 33,000 employees in California as of 2017, and

28

1  1,470 retail locations in the state.[3]  Mr. Ross purchased his AT&T mobile plan in

2  California, visited AT&T retail locations in California, and was injured in

3  California by the acts and omissions alleged herein.

4      15.20. In accordance with 28 U.S.C. § 1391, venue is proper in this District

5  because a substantial part of the conduct giving rise to Mr. Ross' claims occurred

6  in this District and Defendant transacts business in this District.  Mr. Ross

7  purchased his AT&T mobile plan in this District and was harmed in this District,

8  where he resides, by AT&T'sthe acts and omissions of Defendants, as detailed

9  herein.

10 **IV.    ALLEGATIONS APPLICABLE TO ALL COUNTS**

11     16.21.As a telecommunications carrier, AT&T is entrusted with the

12 sensitives mobile account information and personal data of millions of Americans,

13 including Mr. Ross' confidential and sensitive personal and account information.

14 AT&T's duties to safeguard customer information are non-delegable to any other

15 entity, including its third-party call center service providers such as the One Touch

16 Direct entities.

17     17.22.Despite its representations to its customers and its obligations under

18 the law, AT&T has failed to protect Mr. Ross' confidential information.  In October

19 2018, AT&T employees, representatives and agents obtained unauthorized access

20 to Mr. Ross' AT&T mobile account, viewed his confidential and proprietary

21 personal information, and transferred control over Mr. Ross' AT&T mobile

22 number and service from Mr. Ross' phone to a phone controlled by third-party

23 hackers.  The hackers then immediately utilized their control over Mr. Ross'

24 AT&T mobile number—control secured with necessary and direct assistance from

25 AT&T employees, representatives and agents —to access and take control of his

26 personal and digital finance accounts and steal $1 million from Mr. Ross.

27

28 _____

[3] "About Us," AT&T California, *supra* at 1.

– 5 –

1    18.23. This type of telecommunications account hacking behavior is known

2    as "SIM swapping."

3        **A.    SIM Swapping is a Type of Identity Theft Involving the Transfer**

4               **of a Mobile Phone Number**

5    19.24. Mr. Ross was the target victim of an unauthorized "SIM swap" on

6    October 26, 2018.

7    20.25. A "SIM swapping" refers tois a relatively simple scheme, wherein

8    third partiesa hacker take gains control of a victim's mobile phone number and

9    service in order to intercept communications, including text messages, intended for

10   the victim.  The hackers then use that phone number as a key to access and take

11   over the victim's digital accounts, such as email, file storage, and financial

12   accounts.

13   21.26. Most mobile phones, including the iPhone owned by Mr. Ross at the

14   time of his SIM swap, have an internal SIM ("subscriber identity module") card.  A

15   SIM card is a small, removable chip that allows a mobile phone to communicate

16   with the mobile carrier's network and the carrier to know what subscriber account

17   is associated with that mobile phone.  The connection between the mobile phone

18   and the SIM card is made through the carrier, which associates each SIM card with

19   the physical phone's IMEI ("international mobile equipment identity"), which is

20   akin to the mobile phone's serial number.  Without an activated SIM card and

21   effective SIM connection, a mobile phone typically cannot send or receive calls or

22   text messages over the carrier network.  SIM cards can also store a limited amount

23   of account data, including contacts, text messages, and carrier information, and that

24   data can help identify the subscriber.

25   22.27. The SIM card associated with a mobile phone can be changed.  If a

26   carrier customer buys a new phone that requires a different sized SIM card, for

27   example, the customer can associate his or her account with a new SIM card and

28   the new phone's IMEI by working with their mobile carrier to effectuate the

1  change.  This allows carrier customers to move their mobile number from one
2  mobile phone to another and to continue accessing the carrier network when they
3  switch mobile phones.  For a SIM card change to be effective, the carrier ~~must~~ is
4  required by law to authenticate that the change request is legitimate and actualize
5  the change.  AT&T allows its employees, representatives and agents to conduct
6  SIM card changes for its customers remotely or in its retail stores, and does so
7  numerous times daily with inadequate protections against unauthorized SIM
8  swaps.
9      ~~23.~~28. An unauthorized SIM swap refers to an illegitimate SIM card change.
10 During a SIM swap attack, ~~the~~ a carrier representative switches the SIM card
11 number associated with the victim's mobile account ~~is switched~~ from the victim's
12 phone to a phone controlled by a ~~third party~~hacker.  This literally re-routes the
13 victim's mobile phone service — including any incoming data, texts, and phone
14 calls associated with the victim's phone — from the victim's physical phone to a
15 physical phone controlled by the ~~third party (also referred to herein as a~~
16 ~~"hacker")~~hacker.  The hacker's phone then becomes the phone associated with the
17 victim's carrier account, and the hacker receives all of the text messages and phone
18 calls intended for the victim.[4]  ~~Meanwhile~~Simultaneously, the victim's mobile
19 phone loses its ability to connect to the carrier network and displays "No Service".
20     ~~24.~~   Once hackers ~~have~~ are given control over the victim's phone number,
21 they can immediately use that control to access and take complete control of the
22 victim's personal online accounts, such as email and banking accounts, through
23 exploiting password reset links and codes sent via text message to the now-hacker-
24
25 [4] As described by federal authorities in prosecuting SIM swap cases, SIM swapping enables
   hackers to "gain control of a victim's mobile phone number by linking that number to a
26 subscriber identity module ('SIM') card controlled by [the hackers]—resulting in the victim's
   phone calls and short message service ('SMS') messages being routed to a device controlled by
27 [a hacker]." *United States of America v. Conor Freeman, et al.*, No. 2:19-cr-20246-DPH-APP
   (E.D. Mich. Filed Apr. 18, 2019) (hereafter, "Freeman Indictment") (attached hereto as Exhibit
28 A), ECF. No. 1 at ¶ 3.

controlled-phone or the two-factor authentication processes associated with the victim's digital accounts.  Two-factor authentication allows digital accounts to be accessed without a password or allows the account password to be changed.  One common form of two-factor authentication enabled, allowed, and used by AT&T itself is through text messaging.  Rather than enter a password, the hacker requests that a password reset link or code be sent to the mobile phone number associated with the victim's online account which AT&T makes possible.  Because the hacker now controls the victim's phone number, the reset code is sent to the hacker.  The hacker can then log into, and change the password for, the victim's account, allowing the hacker to access and take complete control of the contents of the account.[5]

29.

~~25.~~30. Therefore, obtaining access to and control over a victim's mobile phone service is ~~a~~ the central part of breaking into the victim's other online accounts, such as email services or financial accounts. The sole reason for the fraudulent SIM swap is for the hackers to take control of the victims' financial and online accounts that would not otherwise be accessible. A SIM swap is an extremely high-risk transaction, as it directly enables the hacker to take control of a victim's life.

~~26.~~31. The involvement of a SIM swap victim's mobile carrier is critical to an ~~unauthorized~~effective SIM swap.  In order for an unauthorized SIM swap to occur and for a SIM swap victim to be at any risk, the carrier must pro-actively and intentionally activate the SIM card in the hacker's phone, which simultaneously results in ~~receive a request to change a victim's~~the SIM card in the victim's phone

[5] *See, e.g.*, *Id.* at ¶ 4 ("Once [hackers] had control of a victim's phone number, it was leveraged as a gateway to gain control of online accounts such as the victim's email, cloud storage, and cryptocurrency exchange accounts. Sometimes this was achieved by requesting a password-reset link be sent via [text messaging] to the device control by [hackers].  Sometimes passwords were compromised by other means, and [the hacker's] device was used to received two-factor authentication ('2FA') message sent via [text message] intended for the victim.").

– 8 –

Formatted: Font: 12 pt

1  to be deactivated. At that point, the victim's phone will display "No Service" as

2  their phone can no longer connect to the carrier's network. and effectuate the

3  transfer of the victim's phone number from one SIM card to another.

4      27.32. Upon information and belief, in Mr. Ross's case, not only did AT&T

5  employees employees, representatives and agents access his account without

6  authorization, they also changed his SIM card number to a phone controlled by

7  hackers, who then immediately used that control to steal from Mr. Ross and access

8  sensitive personal information.

9      B.    AT&T Allowed Facilitated Unauthorized Access to Mr. Ross'

10           AT&T Account and Gave Control of His Account to Hackers

11      28.33. AT&T employees, representatives and agents accessed Mr. Ross'

12  AT&T mobile account without his authorization, obtained his confidential and

13  proprietary personal information, and gave complete control of his mobile service

14  to hackers – all without Mr. Ross' knowledge or consent.  Those hackers then

15  immediately used their control over Mr. Ross' mobile phone number to access ant

16  and take control of his sensitive and confidential information and accounts and

17  steal more than $1 million from him and access sensitive personal information

18  such as passports, drivers' licenses and birth certificates.

19      29.34. On October 26, 2018 at approximately 6:00 PM PT, Mr. Ross began

20  receiving notifications that someone was attempting to withdraw currency from his

21  account at Gemini, a provider of financial services.  This caused Mr. Ross

22  significant distress because, at the time, Mr. Ross had $500,000 in USD in his

23  Gemini account.

24      30.35. At approximately the same time, Mr. Ross noticed that his AT&T

25  mobile phone had lost service and displayed "No Service", and he also noticed that

26  he was automatically logged out of his Gmail account.

27      31.36. Mr. Ross immediately suspected that a hacker attack was underway

28  and took his mobile phone to an Apple store for assistance.

– 9 –

1    32.37. Apple representatives assisted Mr. Ross in contacting AT&T Customer

2    Support.  At that time, an AT&T employee employee, representative and agent

3    informed the Apple representatives that Mr. Ross' SIM card had been changed.

4    AT&T employees employees, representatives and agents advised the Apple

5    representatives to provide Mr. Ross with a new SIM card, and then Apple

6    employees replaced the SIM card in Mr. Ross' phone.  AT&T then activated the

7    new SIM card, restoring Mr. Ross' access to his AT&T mobile number and account

8    services.

9    33.38. When Mr. Ross returned home that evening, he called AT&T's

10   customer service to discuss the unauthorized access to his account by AT&T

11   employees employees, representatives and agents and the unauthorized SIM swap.

12   An AT&T customer service representative who identified himself as Ryan S. (with

13   a representative identification number RS410M) informed Mr. Ross that an

14   unauthorized SIM swap had occurred on his service at approximately 5:47 PM PT

15   by AT&T representative Cristelo V. (with a representative identification number

16   CV921H).

17   34.39. AT&T representative Ryan S. also informed Mr. Ross that this

18   unauthorized SIM swap request was made using customer owned and maintained

19   equipment ("COAM"), and explained that COAM is a mobile phone that is not

20   provided by AT&T and would generally be of unknown origin to AT&T (for

21   example, a hacker might purchase a used mobile phone on the internet).

22   Furthermore, Ryan S. expressed surprise that this SIM swap was executed as he

23   said told Mr. Ross it was against AT&T internal policies for an AT&T

24   representative to execute a COAM-originated SIM swap request from anyone

25   calling in to an AT&T call center. Ryan S further represented that he made a

26   specific note of this violation of AT&T's own policy in Mr. Ross' account, reading

27   the note verbally to Mr. Ross "I have informed customer that a SIM card and IMEI

28   change occurred on 10/26/18 at 5:47pm. This change was approved by agent which

– 10 –

1   is a direct violation of the ATT activation policy." After a couple of hours on this
2   call, Ryan S told Mr. Ross that his supervisor would take over the call, which she
3   did, and immediately told Mr. Ross that Ryan S should not have given the
4   information he did to Mr. Ross, and she immediately and abruptly terminated the
5   call, causing further distress to Mr. Ross.

6       35.40. AT&T employees, representatives and agents employees(including
7   Ryan S.) represented to Mr. Ross that AT&T would place a warning on his account
8   stating that he was experiencing fraud and instructing AT&T employees not to
9   change anything on his account – including his SIM card.

10      36.41. AT&T informs its customers that verbal account passcodes—which
11  are different than online account sign-in passwords or the passcodes used to access
12  a mobile device—are used to protect customer's mobile accounts and may be
13  required when a customer manages their AT&T account online or in an AT&T
14  store.[6]

15      37.42. Within minutes of AT&T giving control over Mr. Ross's AT&T mobile
16  number to the hackers, they used that control to access and take over Mr. Ross'
17  accounts at his financial services providers, including but not limited to, Coinbase,
18  Gemini, and Binance. Coinbase and Gemini allow their users to store US dollars
19  that can be used to buy and sell cryptocurrencies (such as bitcoin) within the user's
20  account, in a similar way to how users can store US dollars used to buy and sell
21  stocks at financial services providers such as Fidelity, Schwab, and E*Trade.

22      38.43. At the time of the SIM swap attack, Mr. Ross had approximately
23  $500,000 in US dollars in his Gemini account and approximately $500,000 in US
24  dollars in his Coinbase account.  By utilizing their control over Mr. Ross' mobile
25  phone number, which AT&T gave them, third-party hackers were able to access
26  and take control of these accounts of Mr. Ross and control the entire USD amounts

27  _____

28  [6] "Get info on passcodes for mobile accounts," AT&T, *available at*
    https://www.att.com/esupport/article.html#!/mobile/KM1049472?gsi=tp3wtr.

1   he held in both accounts.  The hackers used Mr. Ross's $1,000,000 in US dollars to

2   purchase bitcoin—a type of cryptocurrency that can be difficult to trace—and then

3   the hackers transferred that bitcoin into accounts they controlled at a different

4   financial services provider.  This made the cryptocurrency exceedingly difficult to

5   trace, let alone recover.[7]

6        ~~39.~~44. The hackers also transferred cryptocurrency worth approximately

7   $3,000 from Mr. Ross' Binance account into accounts they controlled, thereby

8   stealing those funds from him as well.

9        ~~40.~~45. The hackers also used their control over Mr. Ross' AT&T mobile

10  phone number to access, change the passwords, and take control of several of Mr.

11  Ross' most sensitive online accounts, including, but not limited to, his Authy,

12  Google, Yahoo!, and DropBox accounts. In taking over his Google account, the

13  hackers also changed his passwords and the phone number linked to Mr. Ross'

14  two-factor authentication for these accounts, which made it impossible for Mr.

15  Ross to regain immediate access to, let alone control of, these accounts (because

16  any requests to remind him of or reset the password no longer were sent to Mr.

17  Ross' mobile phone, but rather to the hacker's phone).  It took Mr. Ross

18  approximately 7-10 days to regain access to and restore control over his email and,

19  and longer for his other online personal accounts, and several weeks to regain

20  access to the accounts taken over at his other financial services providers.  In

21  addition, the hackers deleted several weeks-worth of emails and substantial data

22  from Mr. Ross' Google account.  Mr. Ross has not been able to recover any of this

23  data.

24

25  _____

26  [7] *See* Investigation Report, Regional Enforcement Allied Computer Team, *California v. Nicholas Truglia* (Oct. 2018) (attached hereto as Exhibit B) at p. 8 ("explaining that "all of Robert R.'s funds stored in Coinbase (approximately $500,000) and Gemini (approximately $500,000) had

27  been held in USD.  The [hacker] used all the funds in USD at both exchanges to purchase bitcoins, then immediately withdrew all of the bitcoins. … This information was subsequently

28  verified by obtaining records directly from Coinbase and Gemini via search warrant.").

41.46. Criminal investigations by the California-based Regional Enforcement
Allied Computer Team ("REACT"), a multi-jurisdictional law enforcement
partnership specializing in cybercrime, into the October 2018 breach of Mr. Ross'
AT&T account and the resulting theft revealed the involvement of a third-party
hacker named Nicholas Truglia, who was arrested by REACT detectives on
November 13, 2018, and faces 21 felony counts in Santa Clara County for SIM
swaps and related thefts, including against Mr. Ross. In their investigation report,
REACT detectives specifically wrote that they obtained a search warrant for AT&T
records pertaining to these thefts, and in response, AT&T provided REACT
investigators with records that showed the same mobile device used by the hacker
(identified through the devices IMEI number) had been used to effect the account
takeovers of Mr. Ross, as well as the accounts of several other victims. In total, the
records indicated that, prior to the unauthorized and illegal SIM swap and theft
facilitated by AT&T against Mr. Ross, 11 unique phone numbers had been SIM
swapped using this device between October 5 and October 26, 2018. It is
incredulous that AT&T not only allowed these other unauthorized SIM swaps to
happen, resulting in several other victims, but certainly knew or should have
known that the same mobile device used to SIM swap other victims was already
being used by a hacker who later used that same device to SIM swap Mr. Ross.
Even the most basic check by AT&T would have easily flagged this IMEI as being
used to perpetrate completely unauthorized and illicit SIM swaps well prior to the
unauthorized and illegal SIM swap against Mr. Ross, which resulted within 45
minutes of the theft of almost his entire life's savings of $1,000,000.

42.47. Mr. Ross' financial and personal life have been uprooted as a result of
AT&T's failure to safeguard his account.

43.48. As a result of the SIM swap detailed above, Mr. Ross lost more than
$1 million in USD.  This money constituted the majority of Mr. Ross' life savings

1   and the money he had saved for his daughter's college fund as well as his own

2   retirement.

3   44.49. The financial strain resulting from the robbery of Mr. Ross has caused

4   extreme emotional distress for Mr. Ross.  The loss of his savings caused massive

5   disruption in Mr. Ross' financial planning and caused him to worry about the

6   financial well-being of himself and his daughter.  He has suffered, and continues to

7   suffer, from severe anxiety, fear, weight gain, depression, and loss of sleep as a

8   direct result.

9   45.50. Additionally, Mr. Ross' and his minor daughter's sensitive and

10  confidential personal information have been compromised as a result of the SIM

11  swaps.  Mr. Ross stored color copies of their passports, drivers' licenses, and birth

12  certificates in the online accounts which were taken over by the hackers as a result

13  of the AT&T-facilitated SIM swap.  Ten years of Mr. Ross' sensitive and

14  confidential tax returns were also compromised.  All of this information is now at

15  extraordinarily high risk of being posted or bought and sold on the dark web by

16  criminals and identity thieves, putting Mr. Ross and his minor child at ongoing risk

17  of significant privacy violations, identity theft, and countless additional unknown

18  harms for the rest of their lives.

19   **C.    AT&T's Failure to Protect Mr. Ross' Account from Unauthorized**

20        **Access Violates Federal Law**

21  46.51. AT&T is the world's largest telecommunications company and

22  provider of mobile telephone services.  As a common carrier,[8] AT&T is governed

23  by the Federal Communications Act of 1934, as amended ("FCA"),[9] and

24  corresponding regulations passed by the FCC.[10]

25

26

27  [8] 47 U.S. Code § 153(51).

    [9] 47 U.S.C. § 151 *et seq.*

28  [10] 47 C.F.R. § 64.2001 *et seq.*

– 14 –

1    ~~47.~~52. Recognizing the sensitivity of data collected by mobile carriers,

2    Congress, through the FCA, requires AT&T to protect Mr. Ross' sensitive personal

3    information to which it has access as a result of its unique position as a

4    telecommunications carrier.[11]

5    ~~48.~~53. Section 222 of the FCA, which became part of the Act in 1996,

6    requires AT&T to protect the privacy and security of information about its

7    customers.  Likewise, Section 201(b) of the Act requires AT&T's practices related

8    to the collection of information from its customers to be "just and reasonable" and

9    declares unlawful any practice that is unjust or unreasonable.[12]

10   ~~49.~~54. AT&T's most specific obligations to protect its customers concerns a

11   specific type of information, called Customer Proprietary Information and Other

12   Customer Information, and known by the acronym "CPNI."[13] Specifically, the

13   FCA "requires telecommunications carriers to take specific steps to ensure that

14   CPNI is adequately protected from unauthorized disclosure."[14]

15   ~~50.~~55. Carriers like AT&T are liable for failures to protect their customers

16   unauthorized disclosures.[15]  The FCC has also stated that "[t]o the extent that a

17   carrier's failure to take reasonable precautions renders private customer

18   information unprotected or results in disclosure of individually identifiable CPNI, .

19   . . a violation of section 222 may have occurred."[16]

20   ~~51.~~56. CPNI is defined as "information that relates to the quantity, technical

21   configuration, type, destination, location, and amount of use of a

22   _____

23   [11] 47 U.S.C. § 222.

     [12] 47 U.S.C. § 201(b).

24   [13] 47 U.S.C. § 222(a).

     [14] Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of*

25   *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of*
     *Customer Proprietary Network Information and Other Customer Information*, 22 F.C.C. Rcd.

26   6927 ¶ 1 (April 2, 2007) (hereafter, "2007 CPNI Order").
     [15] 47 U.S.C. §§ 206, 207.

27   [16] Declaratory Ruling, *In the Matter of Implementation of the Telecommunications Act of 1996:*
     *Telecommunications Carriers' Use of Customer Proprietary Network Information & Other*

28   *Customer Information*, 28 F.C.C. Rcd. 9609 ¶ 30 (2013) (hereafter, "2013 CPNI Order").

1  telecommunications service subscribed to by any customer of a

2  telecommunications carrier, and that is made available to the carrier by the

3  customer solely by virtue of the carrier-customer relationship; and . . . information

4  contained in the bills pertaining to telephone exchange service or telephone toll

5  service received by a customer of a carrier."[17]

6  ~~52.~~57. As AT&T has admitted to customers, SIM swap attacks constitute a

7  CPNI breach.

8  ~~53.~~58. Mr. Ross' CPNI was breached by one or more AT&T ~~employees~~

9  employees, representatives and agents when they accessed his account and

10 swapped his SIM card number without his authorization.  When employees,

11 representatives and agents~~employees~~ accessed Mr. Ross' account, his CPNI was

12 visible.  On information and belief, this included, but was not limited to,

13 information about the configuration, type, and use of his subscribed AT&T

14 services, his personal information, his SIM card details, and his billing

15 information.  AT&T ~~employees~~ employees, representatives and agents then used

16 this information to effectuate an unauthorized SIM swap.

17 ~~54.~~59. This type of unauthorized use of Mr. Ross' CPNI is illegal under the

18 FCA.  The FCA forbids AT&T from "us[ing], disclos[ing], or permit[ting] access

19 to" CPNI, except in limited circumstances.[18]  This extends to the carrier's ~~own~~

20 ~~employees~~ employees, representatives and agents.

21 ~~55.~~60. AT&T may only use, disclose, or permit access Mr. Ross' CPNI: (1)

22 as required by law; (2) with his approval; or (3) in its provision of the

23 telecommunications service from which such information is derived, or services

24 necessary to or used in the provision of such telecommunications service.[19]

25

26

27 [17] 47 U.S.C. § 222(h)(1).
   [18] 47 U.S.C. § 222(c)(1).

28 [19] 47 U.S.C. § 222.

– 16 –

1    Beyond such use, "the Commission's rules require carriers to obtain a customer's

2    knowing consent before using or disclosing CPNI."[20]

3        ~~56.~~61. AT&T failed to protect Mr. Ross from authorized use of his CPNI.

4    AT&T permitted its employees, representatives and agents~~employees~~ to use and/or

5    disclose Mr. Ross' CPNI without obtaining Mr. Ross' knowing consent beforehand.

6    AT&T ~~employees~~ employees, representatives and agents, acting within the scope of

7    their employment and agency, likewise did not seek Mr. Ross' knowing consent

8    before using, disclosing, and/or permitting access to his CPNI when they accessed

9    his account and swapped his SIM card.  Instead, AT&T employees, representatives

10   and agents~~employees~~ authorized a COAM SIM swap over the phone, in violation

11   of AT&T's own internal policies. Because such conduct does not fit within the

12   FCA's recognized legitimate uses, it constitutes a violation of the FCA.

13       ~~57.~~62. Pursuant to the FCA, the FCC has developed comprehensive rules

14   concerning AT&T's obligations under its duty to protect customers' CPNI.[21]  This

15   includes rules "designed to ensure that telecommunications carriers establish

16   effective safeguards to protect against unauthorized use or disclosure of CPNI."[22]

17   The FCC specifically recognizes that "[a]bsent carriers' adoption of adequate

18   security safeguards, consumers' sensitive information… can be disclosed to third

19   parties without consumers' knowledge or consent."[23]  In a 2013 order, the FCC

20   "clarif[ied] existing law so that consumers will know that *their carriers must*

21   *safeguard these kinds of information so long as the information is collected by or*

22

23

24   _____

25   [20] 2007 CPNI Order ¶ 8 (emphasis added).
     [21] *See* 47 CFR § 64.2001("The purpose of the rules in this subpart is to implement section 222 of
26   the Communications Act of 1934, as amended, 47 U.S.C. 222."). The FCC also regularly
     releases CPNI orders that promulgate rules implementing its express statutory obligations. *See*
27   2007 CPNI Order and 2013 CPNI Order.
     [22] 2007 CPNI Order ¶ 9; *see also Id.* at ¶ 35; 47 U.S.C. § 222(c); 47 C.F.R. § 64.2009.
28   [23] *Id.*

– 17 –

1   *at the direction of the carrier and the carrier or its designee[24] has access to or*

2   *control over the information*."[25]

3       ~~58.~~63. Pursuant to these rules, AT&T must "implement a system by which

4   the status of a customer's CPNI approval can be clearly established *prior to* the use

5   of CPNI."[26]  AT&T is also required to "design their customer service records in

6   such a way that the status of a customer's CPNI approval can be clearly

7   established."[27]  The FCC's rules also "require carriers to maintain records that track

8   access to customer CPNI records."[28]

9       ~~59.~~64. Upon information and belief, AT&T has failed to implement such a

10   system.  The fact that Mr. Ross' account was accessed, and his SIM card number

11   was changed without his authorization, demonstrates AT&T's failures in this

12   regard.

13       ~~60.~~65. AT&T is also required to "train their personnel as to when they are

14   and are not authorized to use CPNI, and carriers must have an express disciplinary

15   process in place."[29]

16       ~~61.~~66. Upon information and belief, AT&T has failed to properly train and

17   supervise ~~their~~ its personnel, contractors, representatives and agents, as reflected

18   by an AT&T employee,representative and agent's~~employee's~~ involvement in Mr.

19   Ross' breaches – and that employee, representative's and agent's~~employee's~~ ability

20   to so easily effectuate a SIM swap in violation of AT&T's own internal policies.

21       ~~62.~~67. AT&T has also breached its duty to safeguard Mr. Ross' CPNI from

22   data breaches, in violation of Section 222(a) and Section 201(b) of the FCA.

23

---

24   [24] In the ruling, "designee" is defined as "an entity to which the carrier has transmitted, or
25   directed the transmission of, CPNI or is the carrier's agent." *Id.* n. 1.
     [25] *Id.* at ¶ 1 (emphasis added).
26   [26] 2007 CPNI Order ¶¶ 8-9 (emphasis added); *see also* 47 C.F.R. § 64.2009(a).
     [27] *Id.* ¶ 9.
27   [28] *Id.*
     [29] 47 C.F.R. § 64.2009(b) "Safeguards required for use of customer proprietary network
28   information".

– 18 –

1    ~~63.~~68. The FCC has "[made] clear that carriers' existing statutory obligations

2    to protect their customers' CPNI include[s] a requirement that carriers take

3    reasonable steps, which may include encryption, to protect their CPNI databases

4    from hackers and other unauthorized attempts by third parties to access CPNI."[30]

5    ~~64.~~69. AT&T failed to take reasonable steps to protect Mr. Ross' CPNI,

6    thereby allowing third-party hackers to access his CPNI.

7    ~~65.~~70. The FCC also requires that carriers inform customers – and law

8    enforcement – "whenever a security breach results in that customer's CPNI being

9    disclosed to a third party without that customer's authorization."[31]   This

10   requirement extends to *any* unauthorized disclosure.

11   ~~66.~~71. In adopting this requirement, the FCC rejected the argument that it

12   "need not impose new rules about notice to customers of unauthorized disclosure

13   because competitive market conditions will protect CPNI from unauthorized

14   disclosure."[32]

15   ~~67.~~72. Instead, the FCC found that "[i]f customers and law enforcement

16   agencies are unaware of [unauthorized access], unauthorized releases of CPNI will

17   have little impact on carriers' behavior, and thus provide little incentive for carriers

18   to prevent further unauthorized releases. By mandating the notification process

19   adopted here, we better empower consumers to make informed decisions about

20   service providers and assist law enforcement with its investigations.  This notice

21   will also empower carriers and consumers to take whatever 'next steps' are

22   appropriate in light of the customer's particular situation."[33]  The FCC specifically

23   recognized that this notice could allow consumers to take precautions or protect

24   themselves "to avoid stalking or domestic violence."[34]

25

26   [30] 2007 CPNI Order ¶ 36 (citation omitted).
     [31] 2007 CPNI Order at ¶ 26; *see also* 47 C.F.R § 64.2011(c).
27   [32] 2007 CPNI Order ¶ 30.
     [33] *Id.*
28   [34] *Id.* at n. 100.

68.73. AT&T failed in its duty to safeguard Mr. Ross' CPNI from breaches and, upon information and belief, has failed to properly inform him of such breaches when they occurred.  Mr. Ross never received any documentation or communication alerting him that his CPNI had been breached, even though AT&T knew his CPNI had been breached as a result of the REACT criminal investigation, and knew or should have known that his CPNI had been breached as a result of multiple prior SIM swaps enacted by hackers using the same mobile phone and IMEI.

69.74. Under the FCA, AT&T is not just liable for its own violations of the Act, but also for violations that it "cause[s] or permit[s]."[35]  By failing to secure Mr. Ross' account and protect his CPNI, AT&T caused and/or permitted Mr. Ross' CPNI to be accessed and used by its own employees employees, representatives and agents and by third-party hackers.

70.75. AT&T is also responsible for the acts, omissions, and/or failures of officers, agents, employees, or any other person acting for or employed by AT&T.

**D.    Mr. Ross' Harm was Caused by AT&T'sDefendants' Negligence**

71.76. By failing to secure Mr. Ross' account—and protect the confidential and sensitive data contained therein—and to properly hire, train, and supervise their employees, representatives and agents, AT&T isDefendants are responsible for the foreseeable harm Mr. Ross suffered as a result of AT&T'sDefendants' gross negligence.

72.    Further, AT&T isDefendants are responsible for its their employees' representatives' and agents' failure to obtain Mr. Ross' valid consent before accessing his account and effectuating a SIM swap, as such actions were within the

[Formatted: Indent: Left:  0", First line:  0.5"]

---

[35] *See* 47 U.S.C.A. § 206 (establishing that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter[.]")

1  scope of their ~~agency of~~ employment with ~~AT&T~~Defendants.  On information and

2  belief, ~~AT&T~~Defendants' representatives and agents~~employees~~ were tasked with

3  and able to change customers' SIM card numbers at will – even when such changes

4  violated AT&T company policy. Additionally, ~~AT&T~~Defendants ~~employees'~~

5  representatives' and agents' breach of Mr. Ross' account and the subsequent SIM

6  swap was foreseeable.  AT&T has known for more than a decade that third parties

7  frequently attempt to access and take over mobile customers' accounts for

8  fraudulent purposes. ~~breach of Mr. Ross' account and the subsequent SIM swap~~

9  ~~was foreseeable.~~

10

11  ~~73.~~77. In 2007, the FCC issued an order strengthening its CPNI rules in

12  response to the growing practice of "pretexting."[36]  Pretexting is "the practice of

13  pretending to be a particular customer or other authorized person in order to obtain

14  access to that customer's call detail or other private communication records."[37]

15  This 2007 Order put AT&T on notice that its customers' accounts were vulnerable

16  targets of the third-parties seeking unauthorized access.

17  ~~74.~~78. AT&T and its representatives and agents also knew, or should have

18  known, about the risk SIM swap crimes presented to its customers.  SIM swap

19  crimes have been a widespread and growing problem for years.  The U.S. Fair

20  Trade Commission ("FTC") reported in 2016 that there were 1,038 reported SIM

21  swap attacks *per month* in January 2013, which increased sharply to 2,658 per

22  month by January 2016—2.5 times as many.[38]  The FTC reported that SIM swaps

23  represented 6.3% of all identity thefts reported to the agency in January 2016, and

24

25  ───────────────
     [36] 2007 CPNI Order.

26  [37] *Id.* at ¶ 1.

27  [38] Lori Cranor, FTC Chief Technologist, "Your mobile phone account could be hijacked by an identity thief," Federal Trade Commission (June 7, 2016), *available at*

28  https://www.ftc.gov/news-events/blogs/techftc/2016/06/your-mobile-phone-account-could-be-hijacked-identity-thief (hereafter, "2017 FTC Report").

1   that such thefts "involved all four of the major mobile carriers" – including

2   AT&T.[39]

3        75.79. AT&T knew or should have known that it needed to take steps to

4   protect its customers.  The FTC's 2017 Report stated that "*mobile carriers are in a*

5   *better position than their customers to prevent identity theft through mobile*

6   *account hijacking*[.]"[40]  The FTC urged carriers like AT&T to "adopt a multi-level

7   approach to authenticating both existing and new customers and require their own

8   employees as well as third-party retailers to use it for all transactions."[41]  The FTC

9   also specifically warned carriers like AT&T of the risk that, due to text message

10  password reset requests and two-factor authentication, SIM swapping put

11  subscribers at risk of financial loss and privacy violations:

12          Having a mobile phone account hijacked can waste hours of a
13          victim's time and cause them to miss important calls and
            messages. However, this crime is particularly problematic due
14          to the growing use of text messages to mobile phones as part of
15          authentication schemes for financial services and other
            accounts. The security of two-factor authentication schemes
16          that use phones as one of the factors relies on the assumption
            that someone who steals your password has not also stolen your
17          phone number. *Thus, mobile carriers and third-party retailers*
18          *need to be vigilant in their authentication practices to avoid*
            *putting their customers at risk of major financial loss and*
19          *having email, social network, and other accounts*
20          *compromised.*[42]

21       76.80. AT&T admitted it was aware of SIM swap crimes and the effect they

22  could have on its customers in September 2017 when AT&T's Vice President of

23  Security Platforms published an article on AT&T's "Cyber Aware" blog about SIM

24

25

26  _____

27  [39] *Id.*
    [40] *Id.* (emphasis added).
28  [41] *Id.*
    [42] *Id.* (emphasis added).

– 22 –

1    swaps.[43]  In the article, AT&T acknowledged that subscribers with "valuable

2    accounts that are accessible online" are likely targets of SIM swaps.  AT&T

3    recommended that its customers set up passcodes that would provide "extra

4    security."  These passcodes failed to protect Mr. Ross.

5        77.81. AT&T therefore knew that its customers' accounts were at risk for

6    *longer than a year* before Mr. Ross' account was breached.

7        78.82. AT&T's inadequate security procedures are particularly egregious in

8    light of AT&T's repeated public statements about the importance of cyber security

9    and its public representations about its expertise in this area.  AT&T has an entire

10   series on its public YouTube channel ("AT&T ThreatTraq") dedicated to discussing

11   and analyzing emerging cybersecurity threats.[44]  In its videos, AT&T describes

12   itself as a "network that senses and mitigates cyber threats."[45]

13       79.83. AT&T recognizes the risks that arise when a mobile phone is

14   compromised, stating, "Our phones are mini-computers, and with so much

15   personal data on our phones today, it's also important to secure our mobile

16   devices."[46]  AT&T's advertisements also stress how central a role mobile phones

17   play in its customer's lives, stating: "My phone is my life" and "My phone is

18   everything."  The same ad stresses how the inability to use a mobile phone makes

19   people feel "completely untethered, flailing around."[47]

20       80.84. AT&T markets its ability to identify and neutralize emerging cyber

21   threats for its customers.  In one video, AT&T employees discuss "threat hunting"

22

23   [43] Brian Rexroad, "Secure Your Number to Reduce SIM Swap Scams," AT&T's Cyber Aware
24   (Sep. 2017), *available at* https://about.att.com/pages/cyberaware/ni/blog/sim_swap.
     [44] "AT&T Tech Channel," YouTube, *available at*
25   https://www.youtube.com/user/ATTTechChannel.
     [45] "AT&T – Protect Your Network with the Power of &," VIMEO, *available at*
26   https://vimeo.com/172399153.
     [46] AT&T, "Mobile Security," YOUTUBE (Feb. 12, 2019), *available* at
27   https://www.youtube.com/watch?v=KSPHS89VnX0.
     [47] "AT&T Mobile Movement Campaign – Ads," VIMEO, *available at*
28   https://vimeo.com/224936108.

– 23 –

1  – which they describe as "an active threat analysis where you're actually thinking

2  about your adversary."[48]  They claim that it's "important" and "something [AT&T

3  has] been doing for a long time."[49]  They advise that companies should think about

4  "what would a hacker want to do, where would a hacker go to get my data, what

5  are some of the points on my network that are most vulnerable, or where is the data

6  flow that is potentially going to be a leakage" and state that "having threat hunting

7  as part of a proactive continuous program, integrating with existing security

8  measures, will help [you] stay ahead of the threats."[50]  AT&T failed to heed this

9  advice.

10      ~~81.~~85. Not only did AT&T advise staying ahead of and addressing cyber

11  threats, it also stressed that these practices could even help identify "insider

12  threats"—*employees within the company or authorized representatives and agents*.

13      ~~82.~~86. In an additional video focused on insider threats, AT&T

14  ~~employees~~representatives go on at length about the threat of company insiders

15  selling corporate information *and access*, citing a survey showing that "30% [of

16  respondents] had purposefully sent data outside of their organization at some point

17  in time" and "14% of the people that were interviewed said they would actually

18  sell their corporate log-ins to folks on the outside or sell that data for less than

19  about $250 US."[51]  They cited as a "significant concern" the "individuals that have

20  privileged access, that have broad access inside an organization."[52]  AT&T

21  therefore knew or should have known that there was a significant risk that its own

22  employees, representatives and agents would provide AT&T customer data—

23  including customer account data—and that the risk was heightened when

24

25  [48] AT&T Tech Channel, "The Huntin' and Phishin' Episode," YOUTUBE (Apr. 21, 2017), *available at* https://www.youtube.com/watch?v=3g9cPCiFosk.

26  [49] *Id.*
   [50] *Id.*

27  [51] AT&T ThreatTraq, "The Real Threat of Insider Threats," YouTube (May 5, 2017), *available at* https://www.youtube.com/watch?v=ZM5tuNiVsjs (emphasis added).

28  [52] *Id.*

– 24 –

1   employees had too broad of access to corporate systems, yet failed to put sufficient

2   systems and resources in place to mitigate that risk, despite its own advice to the

3   contrary.

4        83.87. AT&T has also recognized the danger presented to its customers when

5   their email addresses are hacked, as Mr. Ross' was as a result of AT&T's failures.

6   As one AT&T employee puts it: "I think most people do have something valuable

7   [in their email accounts], which is access to all their other accounts, which you can

8   get with a password reset."[53]  They call this "something worth keeping safe."[54]

9   They advised that a "strong, obviously, security awareness program within a

10  company… is extremely important."[55]

11       84.88. In this online video series, AT&T makes specific mention of SIM

12  swapping activity.  In one video, AT&T's Vice President of Security Platforms

13  (Brian Rexroad) and Principal of Technology Security (Matt Keyser) discuss the

14  hack of a forum called OGusers.[56]  In the segment, they discuss the hacking of

15  social media users' account names and point to a news story that highlights—in

16  distinct orange type—that OGusers is a forum popular among people "conducting

17  SIM swapping attacks to seize control over victims' phone numbers."[57]

---

[53] *Id.*
[54] *Id. See also* "Account Hijacking Forum OGusers Hacked", KREBSONSECURITY (May 19, 2019) *at* https://krebsonsecurity.com/2019/05/account-hijacking-forum-ogusers-hacked/
[55] *Id.*
[56] AT&T ThreatTraq, "5/31/19 Account-hacking Forum OGusers Hacked," YOUTUBE (May 31 2019), *available at* https://www.youtube.com/watch?time_continue=234&v=cS4xV3cej3A.
[57] *Id.*; *see also* Freeman Indictment at ¶ 2 (Describing how "discussions—such as discussing the manner and means to [SIM swap] attacks generally, and networking among [SIM swap] hackers]—typically took place on forums such as "OGusers.").



*Figure 2*

<u>Figure 1</u>
<u>AT&T's Vice President of Security Platforms (Brian Rexroad) and Principal of Technology Security (Matt Keyser) discuss the hack of the "OGusers" forum where Sim swappers meet and a news story highlighting how SIM swappers seize control of victims' phone numbers.</u>

85.89. AT&T was therefore well aware of the significant risk that AT&T employees, representatives and agents and SIM swapping presented to its customers, and the need to mitigate such risks, but nonetheless failed to take

– 26 –

1  adequate steps to protect Mr. Ross.  Instead, it continued to make public statements

2  giving rise to a reasonable expectation that AT&T could—and would—protect its

3  customers.

4      86.90. That Mr. Ross was at risk of account breaches at the hands of AT&T

5  employees, representatives and agents is particularly foreseeable—and AT&T's

6  failures are particularly stark—in light of AT&T's history of unauthorized

7  employee, representative and agent access to customer accounts.

8      87.91. In 2015, AT&T faced became subject to an FCC enforcement action,

9  and paid a $25 million civil penalty, for nearly identical failures to protect its

10  customers' sensitive account data.[58]  In that case, as AT&T admitted, employees,

11  representatives and agents at an AT&T call center breached 280,000 customers'

12  accounts.[59]  Specifically, AT&T employees, representatives and agents had

13  improperly used login credentials to access customer accounts and access customer

14  information that could be used to unlock the customers' devices.[60]  The employees

15  then sold the information they obtained from the breaches to a third party.[61]

16      88.92. The FCC concluded that AT&T's "failure to reasonably secure

17  customers' proprietary information violates a carrier's statutory duty under the

18  Communications Act to protect that information, and also constitutes an unjust and

19  unreasonable practice in violation of the Act."[62]

20      89.93. The FCC stressed that the FCA is intended to "ensure that consumers

21  can trust that carriers have taken appropriate steps to ensure that unauthorized

22  persons are not accessing, viewing or misusing their personal information."[63]  It

23

24

25  [58] *In the Matter of AT&T Servs., Inc.*, 30 F.C.C. Rcd. 2808 (2015) at
    https://docs.fcc.gov/public/attachments/DA-15-399A1.pdf

26  [59] *Id.* at ¶ 1.

27  [60] *Id.* at ¶¶ 7, 11.
    [61] *Id.* at ¶ 1.

28  [62] *Id.* at ¶ 2.
    [63] *Id.*

– 27 –

stressed its expectation that "telecommunications carriers such as AT&T… take 'every reasonable precaution' to protect their customers' data[.]"[64]

90.94. As part of its penalty, AT&T entered into a stipulated Consent Decree with the FCC, in which AT&T agreed to develop and implement a compliance plan to ensure appropriate safeguards to protect consumers against similar breaches by improving its privacy and data security practices.[65]

95.    This FCC enforcement action underscores AT&T's knowledge of the risk its employees presented to customers, the prevalence of employee breaches to customer data, the sensitive nature of customer CPNI, and its duties to protect and safeguard that data. Nonetheless, more than 3 years after stipulating to the Consent Decree, AT&T still failed to protect its customer from employee breaches of customer CPNI and other account data, virtually identical to the breach at issue here, heightening the degree of its negligence.

96.    In January 2020, Princeton researchers released a study finding that top U.S. mobile carriers, including AT&T, do little to protect customers from SIM swap fraud.[66] The study stated "We examined the authentication procedures used by five prepaid wireless carriers when a customer attempted to change their SIM card. ***We found that all five carriers used insecure authentication challenges that could be easily subverted by attackers***. We also found that attackers generally only needed to target the most vulnerable authentication challenges, because the rest could be bypassed." The researchers pretended to be the true phone owner and said they forgot answers to security questions study stating, "Our key finding is that, at the time of our data collection, all 5 carriers used insecure authentication challenges that could easily be subverted by attackers." The study also found: (i)

---

[64] *Id.*

[65] *Id.* at ¶¶ 2, 17-18, 21.

[66] *"An Empirical Study of Wireless Carrier Authentication for SIM Swaps"* Kevin Lee, Ben Kaiser, Jonathan Mayer, Arvind Narayanan Dept of Computer Science and Center for Information Technology Policy, Princeton University, January 10, 2020 at https://www.issms2fasecure.com/assets/sim_swaps-01-10-2020.pdf

Callers only needed to successfully respond to one challenge in order to authenticate, even if they had failed numerous prior challenges. (ii) Four-fifths of SIM-swap fraud attempts were successful, and the researchers attempted 50 SIM swaps and successfully completed 39. (iii) AT&T, Verizon and T-Mobile failed the study. (iv) Some carriers even guided them to the correct answer or didn't ask for anything at all. The Princeton study was widely reported in the media and prompted Congress to get involved.  In January 2020, Senator Ron Wyden and 5 other Senators and Congressmen published a letter to FCC Chairman Ajit Pai calling on him to take action to protect consumers against SIM swap fraud, with the Senator stating "SIM swap fraud may also endanger national security. For example, if a cybercriminal or foreign government uses a SIM swap to hack into the email account of a local public safety official, they could then leverage that access to issue emergency alerts using the federal alert and warning system operated by the Federal Emergency Management Agency."[67] Senator Wyden also stated, "Consumers are at the mercy of wireless carriers when it comes to being protected against SIM swaps."[68]

97.    According to a Wall Street Journal ("WSJ") article from November 2019, "He Thought His Phone Was Secure; Then He Lost $24 Million to Hackers," investigators say they know of more than 3,000 SIM swap victims, accounting for at least $70 million in theft nationwide (the real numbers are likely much higher considering that many cases go unreported).[69] The WSJ article states, "the people who investigate these attacks consider them some of the most harmful they have ever seen." [69] Victims include high profile public officials, celebrities, and business executives like Jack Dorsey, the CEO of Twitter, whose 2019 SIM swap hack was profiled in the Forbes article "Why Twitter Blames AT&T For The Hack

---

[67] https://docs.fcc.gov/public/attachments/DOC-362599A1.pdf
[68] https://twitter.com/ronwyden/status/1215757690875600896
[69] https://www.wsj.com/articles/he-thought-his-phone-was-secure-then-he-lost-24-million-to-hackers-11573221600.

Of Its CEO Jack Dorsey Account, Sending Shocking Racist Tweets," and quotes Jeb Su, a Principal Analyst at Atherton Research as saying "*AT&T's poor security policy made this malicious [SIM swap] hack possible.*" [70]  The same hacker who executed Jack Dorsey's SIM swap also successfully hacked the District Attorney prosecuting the hacker who AT&T gave control to Mr. Ross' phone service.[71]

98.    The SIM swap problem is exacerbated by AT&T's sprawling, mismanaged and problematic call center system. In 2017, AT&T's parent (AT&T, Inc.) had 254,000 employees[72] and 38 third-party call centers across eight non-US countries.[73] A study by the Communication Workers of America ("CWA") entitled "AT&T 2018 Jobs Report: Telecom Giant Hollows Out Middle Class Workforce and Outsources to Global Contractors, Even as it Reaps Tax Windfall" details how AT&T's call center operation is fundamentally broken.  Among the key findings were that (i)  employees at AT&T vendor call centers face inadequate training and intense pressure to reach unrealistic quotas  – making it difficult to meet customer's needs; (ii) overseas vendors, paid as little as $1.60 per hour and often rely on other members of their household to make ends meet, provide inaccurate information, fail to solve problems, offer credits or promotions that cannot be honored, and enroll customers in services they did not request; and (iii)  the problems caused by overseas operations add to the burden of U.S. based workers, thereby affecting their work. On information and belief, all of AT&T's numerous customer service representatives are authorized to perform SIM swaps, exacerbating the problem.  In  order to address its organizational failings, AT&T

---

[70] https://www.forbes.com/sites/jeanbaptiste/2019/08/31/why-twitter-blames-att-for-ceo-jack-dorsey-account-hack-sending-shocking-racist-tweets/.

[71] *"Authorities Arrest Alleged Member of Group That Hacked Jack Dorsey"*, Vice by Joseph Cox, November 23, 2019 at https://www.vice.com/en_us/article/gyzawx/authorities-arrest-suspected-jack-dorsey-hacker.

[72] https://www.statista.com/statistics/220683/number-of-atundt-employees-since-2007/

[73] New Report Pulls Back the Curtain on AT&T's Vast Network of Offshored Call Centers at https://cwa-union.org/news/releases/new-report-pulls-back-curtain-on-atts-vast-network-of-offshored-call-centers

could have created a call center dedicated to SIM swaps, and properly vetted, trained and supervised SIM swap customer service representatives, in order to address the problem of unauthorized SIM swaps.

99.   More significantly, fFor many years AT&T has been fully aware of well-established technology solutions to deter and prevent unauthorized SIM swaps and resulting thefts, which it could easily have implemented well *before* Mr. Ross' phone was SIM swapped, but failed and refused to implement:

a.   *Location detection*.  At the exact moment of the SIM swap request, AT&T knew the hacker's phone was in New York City (as detailed in the location data AT&T provided to REACT)[72] and that Mr. Ross' phone was simultaneously in San Francisco, as AT&T tracks customers' location and even sells their location data.[74]  AT&T knew that Mr. Ross and his phone could not simultaneously be in both San Francisco and New York City, and could have easily recognized the SIM swap request as a fraud attempt, denied it, and alerted Mr. Ross.  AT&T was actually profiting off customers' location data at the same time as it did nothing to use the same location data to prevent the unauthorized SIM swap.

b.   *Text message*.  AT&T could have simply sent Mr. Ross a text message asking him to confirm whether he requested the SIM swap. He would have replied "no" and AT&T would have then denied the hacker's SIM swap request and could have reported the fraud attempt to Mr. Ross. Banks regularly text customers in this way to confirm even small, low-risk transactions to prevent fraud, as in the text Mr. Ross received from Bank of America confirming $1 transactions in Figure 2.

---

[74] *FCC Proposes Over $200 Million in Fines Against Four Largest Wireless Carriers For Apparently Failing to Adequately Protect Consumer Location Data February 28, 2020* at https://docs.fcc.gov/public/attachments/DOC-362754A1.pdf

– 31 –



*Figure 2*

A text message from Bank of America to Mr. Ross asking him to confirm
$1 transactions, for the purpose of preventing even low-risk transactions.

AT&T regularly sends text messages to its customers for marketing purposes, and
asks customers to reply if they want to stop receiving such texts, as in the message
AT&T sent to Mr. Ross in Figure 3.



*Figure 3*

A text message from AT&T to Mr. Ross promoting $300 off the latest iPhone in
exchange for an installment upgrade to AT&T's service.

AT&T obviously has the ability to send such simple text messages to its customers
requesting a reply.

    c. *Email confirmation.* AT&T could have simply sent Mr. Ross an
email asking him to confirm whether he requested the SIM swap. AT&T could

Formatted: Font: Italic, Underline

have asked for a confirmation directly within the email or directed him to a legitimate link to confirm the request. Mr. Ross would have replied "no" and AT&T would have then denied the hacker's SIM swap request and could have reported the fraud attempt to Mr. Ross.

d.   *IMEI detection.*  AT&T detects when the same phone has been used in prior unauthorized SIM swaps, and their records (as provided to REACT) show that, prior to the unauthorized SIM swap AT&T facilitated against Mr. Ross, the same device as identified by its IMEI was used in 11 previous unauthorized SIM swaps.[72] AT&T could simply have denied the ability for the phone that was used in previous unauthorized SIM swaps to be used in subsequent SIM swaps, including Mr. Ross', and also could have alerted Mr. Ross to the fraud attempt.

e.   *Voice biometrics.*  Voice-biometrics (or "Voice Id") is a well-established and cost-effective technology that has been implemented by leading financial institutions (e.g., Chase, Wells Fargo and Schwab) to prevent fraud by verifying customers' identities by comparing a caller's voice to a customer (or fraudster) voiceprint stored on file.[75] The technology has also been implemented by in Europe, including by the largest carrier in Europe, Deutsche Telekom.[76] While AT&T developed its own voice biometrics solution called AT&T Watson, the technology was never implemented to prevent SIM swaps, and instead was sold to Interactions Corporation ("Interactions") in 2014 in exchange for an equity stake.[77] Ironically, Interactions continues to promote its voice biometrics solution as "Secure

---

[75] Chase at https://www.chase.com/personal/voice-biometrics, Wells Fargo at https://www.wellsfargo.com/privacy-security/voice-verification, and Schwab at https://www.schwab.com/voice-id.
[76] *Deutsche Telekom turns to biometrics for authentication and fraud detection* https://telecoms.com/491915/dt-turns-to-biometrics-for-authentication-and-fraud-detection/
[77] *AT&T and Interactions Agree to Strategic Transaction in Speech and Multi-Modal Technology Arena* November 5, 2014. https://about.att.com/story/att_and_interactions_agree_to_strategic_transaction_in_speech_and_multi_modal_technology_arena.html

and Convenient Authentication,"[78]  continues to publicly promote the solution to its large corporate customers who have their own call centers (e.g., banks, insurance companies), apublishing a research report entitled "4 emerging technologies that could transform your contact center," which provides in relevant part as follows:

Even as companies take steps to guard their IT environments against a growing barrage of cyberthreats, many are neglecting another vulnerable area: their contact centers.

Social engineering calls to contact centers — in which fraudsters pose as customers and try to trick agents into revealing confidential customer information — are on the rise, according to industry experts, particularly at financial institutions, insurance companies and other businesses that store sensitive data.

Voice biometrics can help your agents know exactly with whom they're talking when they answer a customer call. This technology can recognize voice characteristics passively and verify callers in real time, whether they need to speak to one of your representatives or are using your interactive voice response system.

"By comparing your callers' voiceprints against a database of known fraudster voiceprints, voice biometrics programs can help you identify and track potential thieves before they steal your data."[79]

f.  *Data sharing*.  Mobile phone carriers in other countries have implemented a "data sharing" solution to prevent theft once an unauthorized SIM swap has occurred.  In essence, the carriers allow financial institutions real-time access to their SIM swap data so that the institution can block a requested currency

---

[78] https://www.interactions.com/products/voice-biometrics/
[79] "*4 Emerging Technologies That Could Transform Your Contact Center*" Mike Rajich, AT&T *Director of Contact Center and Enterprise Routing Product Management, AT&T* https://www.business.att.com/learn/research-reports/4-emerging-technologies-that-could-transform-your-contact-center.html

transfer if there has been a SIM swap within a specified time frame (e.g., within 48 hours of the transfer request), as asince very recent SIM swap combined with a withdrawal request is an extremelya strong indicator of fraud.  The data sharing solution is widely known and broadly used in the industryby major carriers outside of the US.  Wired magazine published an article entitled "The SIM Swap Fix That the US isn't Using," whuich states in relevant part that "While foreign phone carriers are sharing data to stop SIM swap fraud, US carriers are dragging feet."[80] Wired describes that even carriers in developing countries such as Mozambique implemented the solution within a few months of understanding the extent of the problem, and that the Head of IT, Cyber Security & Core Data Networks at Vodacom reported that "[the solution] reduced their SIM swap fraud to nearly zero overnight".[81]  Third party aggregators such as Prove.com (formerly Payfone, Inc.) and Telesign Corporation, who license SIM swap data from non-US carriers and sell it as a fraud prevention offering to banks. Figure 4 shows how all four major carriers in the United Kingdom ("UK"), including  British Telecom, Vodafone, O2 and Three, provide their SIM swap data to Prove.com, which in turn sells a fraud prevention service to banks enabling them to do real-time SIM swap checks to at the time of customers' high-risk transactions.[82]

---

[80] *The SIM Swap Fix That the US Isn't Using, Wired*, Andy Greenberg, April 26, 2019 https://www.wired.com/story/sim-swap-fix-carriers-banks/.
[81] Id.
[82] https://info.prove.com/psd2-sca-uk-mobile-authentication



Figure 4

Prove.com system for aggregating SIM swap data from the top 4 UK carriers

and enabling clients, such as banks, to perform real-time SIM swap checks

100.   Had AT&T implemented any of the foregoing low cost and easy to implement technology solutions, Mr. Ross would not have been the victim of an unauthorized SIM swap.

101.   Instead of implementing solutions to **prevent** unauthorized SIM swaps, AT&T appears to have made the conscious business decision to profit from unauthorized SIM swaps  **after** they have occurred.  On September 18, 2018, six weeks before Mr. Ross' SIM swap, AT&T, Verizon and T Mobile publicly announced the joint business scheme they had been developing for months called "Project Verify," now known as ZenKey, to profit from the SIM swap problem. [83]

---

[83] *U.S. Mobile Giants Want to be Your Online Identity* at https://krebsonsecurity.com/tag/project-verify/

Formatted: Centered

Formatted: Font: Bold, Italic

Formatted: Font: Bold, Italic

Formatted: Font: (Default) Times New Roman, 14 pt

102.   ZenKey is marketed to consumers as an easier and more secure way to log into other online services, stating "Your carrier has a unique ability to identify and protect your mobile identity" and that ZenKey checks for suspicious activity at the carrier (Figure 5), denoting a real-time SIM swap check (as this is the most significant suspicious activity that can occur in a customer's mobile account).[84]



Figure 5

AT&T/ZenKey promotes that it "has a unique ability to identify and protect your mobile identity" and checks for suspicious activity.

AT&T's ZenKey consumer app is available to consumers currently in the Apple and Google  app stores for iPhone and Android devices, as shown in Figure 6.[85]

---

[84] https://myzenkey.com/how-it-works/
[85] iPhone app at https://apps.apple.com/us/app/zenkey-powered-by-at-t/id1490293601, Android app at https://play.google.com/store/apps/details?id=com.att.cso.consumer.MKapp&hl=en_US

1
2
3
4
5
6
7
8
9
10
11



Figure 6

AT&T ZenKey apps for iPhone and Android

At the same time, ZenKey is marketed to financial institutions as an identity and authentication scheme through its "Trust Services" offering, to prevent fraud, with the clear representation that its purpose is to combat SIM swap fraud: "SIM Swap Fraud has already cost businesses hundreds of millions of dollars and the threat is increasing. With ZenKey, fraudsters can no longer access your users' accounts based on stolen credentials and a simple SIM Swap."[86] ZenKey's benefits page states "SIM swap fraud is on the rise and has cost businesses hundreds of millions of dollars ZenKey offers a suite of APIs and event alerts (Trust Services) for Service Providers to receive on-demand fraud signals and automatic indicators."[87] The ZenKey Trust Services proposal, as shown in Figure 7 is effectively executing the same type of real-time SIM swap database check as the data sharing method as described above.

_____

[86] https://myzenkey.com/trust-services/
[87] https://myzenkey.com/business-benefits/

Figure 7

ZenKey's "Trust Services" offering for financial institutions

ZenKey seeks to charge fees to financial institutions in exchange for doing real-time checks against carrier databases to verify when a SIM swap (authorized or not) was last done,[88] and its Portal Agreement Terms of Service provides that "Certain services accessed or available through the [ZenKey] Portal, especially

---

[88] ZenKey website at https://myzenkey.com/trust-services/

services for which You [e.g. a bank] are asked to subscribe or pay money, may have their own terms and conditions, including but not limited to the Service Agreement."[89] *ZenKey has failed to date in the marketplace, and has not yet been adopted by financial institutions.*

103. By not implementing even basic solutions to mitigate, let alone substantially reduce SIM swap fraud, AT&T maintains a larger revenue opportunity for ZenKey, as more unauthorized SIM swaps lead to more fraud at banks, which result in a greater need for banks to pay for and check SIM swap data in real-time. While ZenKey has failed to date in the marketplace, and has not yet been adopted by financial institutions, AT&T and its Zenkey partner-competitors continue to invest in it (to date, they have invested around $200 million), promote it and develop it, rather than implement simple solutions to broadly prevent unauthorized SIM swaps.

91. Rather than having easily and expeditiously implemented a data sharing solution in which AT&T licensed their SIM swap database to third party aggregators (such as Prove.com[90] or TeleSign Corporation[91]) or directly to financial institutions (such as Coinbase or Gemini), to enable them to do real-time database checks at the time of a high-risk transactions (as non-US carriers do[80]), AT&T focused its efforts developing ZenKey in collusion with Verizon and T-Mobile in their ill-conceived (and to-date failed) attempt to more directly profit and control the authentication market opportunity.

## F. Defendants Are Liable for the Acts of Their Employees, Representatives and Agents

[89] https://portal.myzenkey.com/terms
[90] *The End of Dangerous SIM Swap Fraud is Here: Payfone Extends Real-Time SIM Swap Detection Algorithms* at https://www.payfone.com/press/the-end-of-dangerous-sim-swap-fraud-is-here/
[91] How TeleSign Protects Transactions from SIM Swap Fraud at https://www.telesign.com/blog/how-telesign-protects-transactions-from-sim-swap-fraud

1   ~~92.~~ 104.        ~~AT&T is~~Defendants are liable for the acts of ~~its~~ their

2   employees, representatives and agents who facilitated the unauthorized access to,

3   and resulting theft from, Mr. Ross.

4   ~~93.~~ 105.        ~~AT&T~~Defendants failed to put in place adequate systems and

5   procedures to prevent the unauthorized employee, representative and agent access

6   to Mr. Ross' account and related data. ~~AT&T~~Defendants failed to properly hire and

7   supervise ~~its~~ their employees, representatives and agents, allowing them to access

8   Mr. Ross' sensitive and confidential account data without his authorization and

9   provide that data to third parties.

10   ~~94.~~ 106.        In the context of AT&T's enterprise as a telecommunications

11   carrier, an employee, representative and agent accessing a customer's account

12   information and effectuating a SIM swap—even without authorization—is not so

13   unusual or startling that it would be unfair to include the loss resulting from such

14   unauthorized access among other costs of AT&T's business – particularly in light of

15   AT&T's awareness of the risk of SIM swaps to its customers.

16   ~~95.~~ 107.        Further, imposing significant liability on AT&T and its agents

17   may prevent recurrence of SIM swap behavior because it creates a strong incentive

18   for vigilance and proper safeguarding of customers' data by AT&T—which, in the

19   case of its customers, is the sole party in the position to guard substantially against

20   this activity, as it is the custodian and guardian of this data.

21   ~~96.~~ 108.        As a customer of AT&T, Mr. Ross is entitled to rely upon the

22   presumption that AT&T and the employees, representative and agents entrusted

23   with the performance of AT&T's business have faithfully and honestly discharged

24   the duty owed to him by AT&T, and that they would not gain unauthorized access to

25   his account.

26   109.   The reasonableness of Mr. Ross' expectations that AT&T would

27   safeguard his data is confirmed by the fact that the federal agency responsible for

28   overseeing AT&T's duties to its customers, the FCC, has stated that it "fully

– 41 –

expect[s] carriers to take every reasonable precaution to protect the confidentiality
of proprietary or personal customer information."~~65F~~[92]

**F.**          **AT&T's Misrepresentations and Omissions.**

~~97.~~110.          AT&T's Privacy Policy, and the "Privacy Commitments"
included therein, falsely represents and fails to disclose material information about
its data security practices.

~~98.~~111.          In its Privacy Policy, AT&T promised to protect Mr. Ross'
privacy and personal information, including by using "security safeguards."  AT&T
further pledges that it will not sell customer data.  These representations created an
expectation that Mr. Ross' AT&T account and associated data would be safe and
secure, that employees, representatives and agents would not access his account
without authorization, that his data would be protected from unauthorized

---

## Our Privacy Commitments

**Our privacy commitments are fundamental to the way we do business every day. These apply to everyone who has a relationship with us - including customers (wireless, Internet, digital TV, and telephone) and Web site visitors.**

- We will protect your privacy and keep your personal information safe. We use encryption and other security safeguards to protect customer data.
- We will not sell your personal information to anyone, for any purpose. Period.
- We will fully disclose our privacy policy in plain language, and make our policy easily accessible to you.
- We will notify you of revisions to our privacy policy, in advance. No surprises.
- You have choices about how AT&T uses your information for marketing purposes. Customers are in control.
- We want to hear from you. You can send us questions or feedback on our privacy policy.

---

[92] 2007 CPNI Order ¶ 64.

– 42 –

Formatted: Indent: Left:  0.56",  No bullets or numbering

1   disclosure, and that he could control how and when his data was accessed. Figure 5,

2   immediately below, is an excerpt from AT&T's Privacy Policy.

3                           *Figure 5* [93]

4         ~~99.~~112.        AT&T's representation that it "uses encryption and other

5   security safeguards to protect customer data" is false and extremely misleading.

6         ~~100.~~113.        As alleged fully above, AT&T allowed its employees,

7   representatives and agents to access Mr. Ross' account, and the CPNI and other

8   sensitive data contained therein, without his authorization.  AT&T's statement that it

9   would use encryption and other security safeguards to protect customers' data is

10  therefore a material misrepresentation.

11        ~~101.~~114.        Upon information and belief, AT&T's security safeguards were

12  inadequate, including its system which—upon information and belief—allowed an

13  individual employee, representative and agent to conduct SIM swaps without

14  adequate technical safeguards and oversight, even when that employee,

15  representative and agent authorizes a COAM SIM swap over the phone in violation

16  of company policy.

17        ~~102.~~115.        "Having one employee who can conduct these SIM swaps

18  without any kind of oversight seems to be the real problem," says Lieutenant John

19  Rose, a member of the California-based Regional Enforcement Allied Computer

20  Team ("REACT"), a multi-jurisdictional law enforcement partnership specializing

21  in cybercrime.~~67F~~[94]  "And it seems like [the carriers] could really put a stop to it if

22  there were more checks and balances to prevent that. It's still very, very easy to SIM

23  swap, and something has to be done because it's just too simple. Someone needs to

24  light a fire under some folks to get these protections put in place."

25

26

_____

27  [93] "Privacy Policy," AT&T, attached hereto as Exhibit C.

28  [94] Busting SIM Swappers and SIM Swap Myths," KREBSONSECURITY (Nov. 18, 2018), *available
    at https://krebsonsecurity.com/2018/11/busting-sim-swappers-and-sim-swap-myths*.

1    ~~103.~~116.     AT&T failed to put in place adequate systems and procedures to

2   prevent the unauthorized employee, representative and agent access to and ~~sale~~ take

3   over of Mr. Ross' account and related data.  In connection with subsequent criminal

4   investigations into Mr. Ross' SIM swap, AT&T informed law enforcement that it

5   had the capacity to see how many different SIM cards had been associated with the

6   same single mobile phone's IMEI.~~68F~~[95]  In other words, AT&T could see when one

7   mobile phone had multiple SIM cards associated with it in a short amount of

8   time.~~69F~~[96]

9    ~~104.~~117.     AT&T also informed law enforcement that the hacker involved

10  in Mr. Ross' SIM swap had requested that *eleven different phone numbers* be moved

11  onto his phone (identified by its IMEI number) in the twenty-one days before Mr.

12  Ross' swap.~~70F~~[97]  The hacker sometimes moved three different AT&T numbers

13  onto the same phone *in a single day*.~~71F~~[98]  AT&T certainly had the capability to see

14  this behavior, and could and should have flagged it as suspicious.  If AT&T had

15  proper security safeguards in place, it would have recognized this behavior, flagged

16  it as suspicious, and prevented any further SIM swaps onto that phone – thereby

17  protecting Mr. Ross.

18   ~~105.~~118.     Additionally, as alleged fully above, AT&T failed to establish a

19  consent mechanism that verified proper authorization before Mr. Ross' data was

20  accessed and provided to third parties.  AT&T's statement that it would use

21  encryption and other security safeguards to protect customers' data is therefore a

22  material misrepresentation.  AT&T easily detected that the same phone was used in

23  eleven prior unauthorized SIM swaps *before* the unauthorized SIM swap on Mr.

24  Ross' phone, and gave this information to the REACT cybercrime task force.[72]

25  However, AT&T did nothing to stop the hacker from using the same phone for

---

[95] Ex. B. at pp. 8, 22.
[96] *Id.*
[97] *Id.*
[98] *Id.* at 22.

– 44 –

**Formatted:** Footnote Reference, Font:

1  multiple unauthorized SIM swaps, and had no voice biometric system or other
2  solution in place to  prevent the unauthorized SIM swaps.

3       106.119.     AT&T's representation that it "will protect [customers'] privacy
4  and keep [their] personal information safe" is false and misleading.

5       107.120.     As alleged fully above, AT&T failed to establish a consent
6  mechanism that verified proper authorization before Mr. Ross' account and the data
7  therein were accessed and used without his authorization or consent and disclosed
8  to third parties.  Mr. Ross' privacy and personal information was not safe, as
9  demonstrated by the breach of his AT&T account.  AT&T's statement that it would
10  protect customers' privacy and keep their personal information safe is therefore a
11  material misrepresentation.

12       108.121.     AT&T also makes numerous false or misleading representations
13  concerning its treatment of customers' data that qualifies as CPNI under the FCA.

14       109.122.     AT&T explicitly and falsely represents in its Privacy Policy that
15  it does not "sell, trade or share" their CPNI:

16           We do not sell, trade or share your CPNI with anyone
17           outside of the AT&T family of companies* or our
18           authorized agents, unless required by law (example: a
             court order).72F[99]

19       110.123.     As alleged fully above, AT&T and its employees,
20  representatives and agents provided access to Mr. Ross' CPNI to third-party
21  hackers.  This use was not required by law and was instead *prohibited* by law.

22

23

24

25

---

26  [99] "Customer Proprietary Network Information (CPNI)," AT&T, Ex. C at 31-32.  The "AT&T
27  family of companies" is defined as "those companies that provide voice, video and broadband-
    related products and/or services domestically and internationally, including the AT&T local and
28  long distance companies, AT&T Corp., AT&T Mobility, DIRECTV, and other subsidiaries or
    affiliates of AT&T Inc. that provide, design, market, or sell these products and/or services."  *Id.*

1    111.124.     AT&T also states that it only uses CPNI "internally" and its

2    *only* disclosed use of CPNI is "among the AT&T companies and our agents in order

3    to offer you new or enhanced services."73F[100]

4    112.125.     AT&TDefendants' employees', representatives' and agents' use

5    of Mr. Ross' account and related data as described herein was not for "internal"

6    AT&T purposes, nor was it used to market AT&T services.  AT&T's statements

7    regarding the use of customer CPNI are therefore material misrepresentations.  Its

8    failure to disclose this is a material omission.

9    113.126.     AT&T also falsely represents that it "uses technology and

10   security features, and strict policy guidelines with ourselves and our agents, to

11   safeguard the privacy of CPNI."

12   114.127.     As alleged fully above, AT&T and its agents failed to safeguard

13   Mr. Ross' CPNI.  Instead, it stored customer CPNI in such a way that unauthorized

14   access was easily obtained by employees and third parties.  AT&T's statements

15   regarding the technology and security features it uses to safeguard customer CPNI

16   are therefore material misrepresentations.

17   115.128.     AT&T was obligated to disclose the weaknesses and failures of

18   its account and data security practices, as AT&T had exclusive knowledge of

19   material facts not known or knowable to its customers, AT&T actively concealed

20   these material facts from Mr. Ross, and such disclosures were necessary to

21   materially qualify its representations that it took measures to protect consumer data

22   and to materially qualify its partial disclosures concerning its use of customers'

23   CPNI.  Further, AT&T was obligated to disclose its practices under the FCA.

24   116.129.     A reasonable person would be deceived and misled by AT&T's

25   misrepresentations, which clearly indicated that AT&T would safeguard its

26   customers' personal information and CPNI.

27

28   ───────────────
     [100] *Id.*

1    ~~117.~~130.     AT&T intentionally misled Mr. Ross regarding its data security

2    practices in order to maintain his business, make money from his account, and

3    evade prosecution for its unlawful acts.  Furthermore, AT&T has invested millions

4    into ZenKey to profit from the SIM swap problem, thereby incentivizing itself (and

5    its two primary competitors) to not timely solve the problem to protect its

6    customers, for which other carriers have implemented highly effective solutions.

7        131.    AT&T's representations that it protected customers' personal

8    information, when in fact it did not, were false, deceptive, and misleading and

9    therefore a violation of the FCA.

10

11   **VI.   CLAIMS FOR RELIEF**

12                        **COUNT I**

13   **Violations of The Federal Communications Act, 47 U.S.C. § 201 *et seq.***

     ~~118.~~132.     Plaintiff Robert Ross realleges and incorporates all of the

14   preceding paragraphs as though fully set forth in this cause of action.

15       ~~119.~~133.     ~~AT&T has~~Defendants have violated 47 U.S.C. § 222(a) by

16   failing to protect the confidentiality of Mr. Ross' CPNI, as detailed herein.

17       ~~120.~~134.     ~~AT&T has~~Defendants have violated 47 U.S.C. § 222(c) by

18   using, disclosing, and/or permitting access to Mr. Ross' CPNI without the notice,

19   consent, and/or legal authorization required under the FCA, as detailed herein.

20   ~~AT&T~~Defendants also caused and/or permitted third parties to use, disclose, and/or

21   permit access to Mr. Ross' CPNI without the notice, consent, and/or legal

22   authorization required under the FCA, as detailed herein.

23       ~~121.~~135.     As fully alleged above, Mr. Ross has suffered injury to his

24   person, property, health, and reputation as a consequence of ~~AT&T's~~Defendants'

25   violations of the FCA.  Additionally, Mr. Ross has suffered emotional damages,

26   including severe anxiety and depression, mental anguish, and suffering as a result of

27   Defendants' ~~AT&T's~~ acts and practices. These emotional damages have led directly

28

                                – 47 –

to physical issues; for example, Mr. Ross began stress-eating which resulted in Mr. Ross gaining approximately 40 pounds in only a few months following the DefendantsAT&T-facilitated thefts.

136.    Mr. Ross seeks the full amount of damages sustained as a consequence of Defendants' AT&T's violations of the FCA, together with reasonable attorneys' fees, to be fixed by the Court and taxed and collected as part of the costs of the case.  Mr. Ross also moves for a writ of injunction or other proper process, mandatory or otherwise, to restrain Defendant AT&T and its their officers, agents, or representatives from further disobedience of the 2007 and 2013 CPNI Orders, or to compel their obedience to the same.

**COUNT II**
**Violations of The California Unfair Competition Law ("UCL")**
**under the Unlawful, Unfair and Fraudulent Prongs,**
**California Business & Professional Code § 17200 _et seq_.**

122.137.    Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

123.138.    California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair or fraudulent business act or practice."  AT&T'sDefendants' business acts and practices complained of herein were unlawful, unfair, and fraudulent.

124.139.    AT&T made material misrepresentations and omissions concerning its safeguarding of Mr. Ross' CPNI.  As alleged fully above, a reasonable person would attach importance to the privacy of his sensitive account data in determining whether to contract with a mobile phone provider.

125.140.    AT&TDefendants had a duty to disclose the nature of its their inadequate security practices and failures in hiring, training, and supervising staff. AT&TDefendants had exclusive knowledge of material facts not known or

– 48 –

knowable to ~~its~~ AT&T customers and Defendants ~~AT&T~~ actively concealed these
material facts from ~~its~~ customers.

126.141.    Further, additional disclosures were necessary to materially
qualify AT&T's representations that it did not sell consumer data and took measures
to protect that data, and its partial disclosures concerning its use of customers'
CPNI.  AT&T was obligated to disclose its practices, as required by the FCA.  The
magnitude of the harm suffered by Mr. Ross underscores the materiality of AT&T's
omissions.

127.142.    A reasonable person, such as Mr. Ross, would be deceived and
misled by AT&T's misrepresentations, which indicated that Defendants ~~AT&T~~
would safeguard its customers' personal and proprietary information.

128.143.    AT&T intentionally misled its customers regarding its data
protection practices in order to attract customers and evade prosecution for its
unlawful acts.

129.144.    Defendants' ~~AT&T's~~ actions detailed herein constitute an
unlawful business act or practice.  As alleged herein, Defendants' ~~AT&T's~~ conduct
is a violation of the California constitutional right to privacy and, the FCA, ~~and the~~
~~CLRA~~.

130.145.    Defendants' ~~AT&T's~~ actions detailed herein constitute an unfair
business act or practice.

131.146.    Defendants' ~~AT&T's~~ conduct lacks reasonable and legitimate
justification in that Mr. Ross has been misled as to the nature and integrity of
AT&T's goods and services and has suffered injury as a result.

132.147.    The gravity of the harm caused by Defendants' ~~AT&T's~~
practices far outweigh the utility of ~~AT&T's~~ their conduct.  Defendants' ~~AT&T's~~
practices were contrary to the letter and spirit of the FCA and its corresponding
regulations, which require mobile carriers to disclose customers' CPNI only upon
proper notice, consent, and authorization, and aims to vest carrier customers with

1    control over their data.  Due to the surreptitious nature of ~~Defendants'~~ AT&T's

2    actions, Mr. Ross could not have reasonably avoided the harms incurred as a result.

3        ~~133.~~148.    As the FCA establishes, it is against public policy to allow

4    carrier employees or other third parties to access, use, or disclose

5    telecommunications customers' sensitive account information.  The effects of

6    ~~Defendants'~~ AT&T's conduct are comparable to or the same as a violation of the

7    FCA.

8        ~~134.~~149.    ~~Defendants'~~ AT&T's actions detailed herein constitute a

9    fraudulent business act or practice.

10       ~~135.~~150.    As established herein, Mr. Ross has suffered injury in fact and

11   economic harm as a result of AT&T's unfair competition.  Additionally, had

12   ~~Defendants~~ AT&T disclosed the true nature and extent of ~~its~~ their data security and

13   protection practices—and the flaws inherent in ~~their~~its systems—and ~~its~~ their

14   unwillingness to properly protect its customers, Mr. Ross would not have

15   subscribed to or paid as much money for AT&T's mobile services.

16       ~~136.~~151.    Mr. Ross seeks injunctive and declaratory relief for ~~Defendants'~~

17   ~~AT&T's~~ violations of the UCL.  Mr. Ross seeks public injunctive relief against

18   ~~Defendants'~~ AT&T's unfair and unlawful practices in order to protect the public and

19   restore to the parties in interest money or property taken as a result of ~~Defendants'~~

20   ~~AT&T's~~ unfair competition.  Mr. Ross seeks a mandatory cessation of ~~Defendants'~~

21   ~~AT&T's~~ practices, and proper safeguarding of AT&T account data.

22

23                            **COUNT III**
                **Violations of the California Constitutional Right to Privacy**

24       ~~137.~~152.    Plaintiff Robert Ross realleges and incorporates all of the

25   preceding paragraphs as though fully set forth in this cause of action.

26       ~~138.~~153.    The California Constitution declares that, "All people are by

27   nature free and independent and have inalienable rights. Among these are enjoying

28

                               – 50 –

1   and defending life and liberty, acquiring, possessing, and protecting property, and

2   pursuing and obtaining safety, happiness, and privacy."  Cal. Const. Art. I, § 1.

3        139.154.      Mr. Ross has a reasonable expectation of privacy in his mobile

4   device and his AT&T account information.

5        140.155.      Defendants AT&T intentionally intruded on and into Mr. Ross'

6   solitude, seclusion, or private affairs by allowing its employees and third parties to

7   improperly access Mr. Ross' confidential AT&T account information without proper

8   consent or authority.

9        141.156.      The reasonableness of Mr. Ross' expectations of privacy is

10  supported by AT&T and its agents' unique position to safeguard his account data,

11  including the sensitive and confidential information contained therein, and protect

12  Mr. Ross from SIM swap attacks.

13       142.157.      AT&T and its agents' intrusions into Mr. Ross' privacy are

14  highly offensive to a reasonable person.  This is evidenced by federal legislation

15  enacted by Congress and rules promulgated and enforcement actions undertaken by

16  the FCC aimed at protecting AT&T customers' sensitive account data from

17  unauthorized use or access.

18       143.158.      The offensiveness of Defendants' AT&T's conduct is

19  heightened by its AT&T's material misrepresentations to Mr. Ross concerning the

20  safety and security of his account.

21       144.159.      Mr. Ross suffered great personal and financial harm by the

22  intrusion into his private affairs, as detailed throughout this Complaint.

23       145.160.      Defendants' AT&T's actions and conduct complained of herein

24  were a substantial factor in causing the harm suffered by Mr. Ross.  But for

25  AT&T Defendants' agents' and employees' unauthorized access to Mr. Ross' account

26  and AT&T's failure to protect Mr. Ross from such harm through adequate security

27  and oversight systems and procedures, Mr. Ross would not have had his personal

28  privacy repeatedly violated and would not have been a victim of SIM swap theft

1  resulting in his loss of $1,000,000 in cash and the breach of sensitive personal
2  information.
3      161.   As a result of Defendants' AT&T's actions, Mr. Ross seeks nominal
4  and punitive damages in an amount to be determined at trial.  Mr. Ross seeks
5  punitive damages because Defendants' AT&T's actions were malicious, oppressive,
6  and willful.  Defendants AT&T knew or should have known about the risks faced by
7  Mr. Ross, and the grave consequences of such risks.  Nonetheless, Defendants
8  AT&T utterly failed to protect Mr. Shapiro Ross, and instead, AT&T has invested
9  millions of dollars into a scheme to profit from SIM swaps through ZenKey
10  instead allowing its employees to profit to his detriment.  Punitive damages are
11  warranted to deter DefendantsAT&T from engaging in future misconduct.
12
13                          **COUNT IV**
                            **Negligence**
14      146.162.    Plaintiff Robert Ross realleges and incorporates all of the
15  preceding paragraphs as though fully set forth in this cause of action.
16      147.163.    Defendants AT&T owed a duty to Mr. Ross—arising from the
17  sensitivity of his AT&T account information and the foreseeability of harm to Mr.
18  Ross should Defendants AT&T fail to safeguard and protect such data—to exercise
19  reasonable care in safeguarding his sensitive personal information.  This duty
20  included, among other things, designing, maintaining, monitoring, and testing
21  AT&T's and its agents', partners', and independent contractors' systems, protocols,
22  and practices to ensure that Mr. Ross' information was adequately secured from
23  unauthorized access.
24      148.164.    Federal law and regulations, as well as AT&T's privacy policy,
25  acknowledge AT&T'sDefendants' duty to adequately protect Mr. Ross' confidential
26  account information.
27
28
                            – 52 –

1    ~~149.~~165.      Defendants ~~AT&T~~ owed a duty to Mr. Ross to protect his

2    sensitive account data from unauthorized use, access, or disclosure.  This included a

3    duty to ensure that his CPNI was used, accessed, or disclosed only with proper

4    consent.

5    ~~150.~~166.      Defendants ~~AT&T~~ owed a duty to Mr. Ross to implement a

6    system to safeguard against and detect unauthorized access to Mr. Ross' AT&T data

7    in a timely manner.

8    ~~151.~~167.      Defendants ~~AT&T~~ owed a duty to Mr. Ross to disclose the

9    material fact that ~~its~~ their data security practices were inadequate to safeguard Mr.

10   Ross' AT&T account data from unauthorized access by its own employees and

11   others.

12   ~~152.~~168.      AT&T had a special relationship with Mr. Ross due to its status

13   as his telecommunications carrier, which provided an independent duty of care.

14   AT&T had the unique ability to protect its systems and the data it stored thereon

15   from unauthorized access.

16   ~~153.~~169.      Mr. Ross' willingness to contract with AT&T, and thereby

17   entrust AT&T with his confidential and sensitive account data, was predicated on

18   the understanding that AT&T and its agents would undertake adequate security and

19   consent precautions.

20   ~~154.~~170.      Defendants ~~AT&T~~ breached ~~its~~ their duties by, *inter alia*: (a)

21   failing to implement and maintain adequate security practices to safeguard Mr.

22   Ross' AT&T account and data—including his CPNI—from unauthorized access, as

23   detailed herein; (b) failing to detect unauthorized accesses in a timely manner; (c)

24   failing to disclose that ~~AT&T's~~ their data security practices were inadequate to

25   safeguard Mr. Ross' data; (d) failing to supervise ~~its~~ their agents and employees and

26   prevent ~~employees~~ them from accessing and utilizing Mr. Ross' AT&T account and

27   data without authorization; and (e) failing to provide adequate and timely notice of

28   unauthorized access.

1    155.171.      Defendants were AT&T was also negligent in its their

2    authorization of Mr. Ross' SIM card swap.  Defendants AT&T knew or should have

3    known that at least ten different AT&T numbers had been moved to the same

4    mobile phone (identified by its IMEI) in the days weeks leading up to Mr. Ross'

5    SIM swap.  Defendants AT&T knew or should have known that this was highly

6    suspicious.  Nevertheless, Defendants AT&T effectuated the transfer of Mr. Ross'

7    AT&T account to this same mobile phone.  Defendants AT&T had the technical

8    capacity to track this behavior—as reflected in its willingness to do so quickly for

9    law enforcement—but nonetheless failed to utilize it for the benefit and protection

10   of Mr. Ross.

11   156.172.      But for Defendants' AT&T's breaches of its their duties, Mr.

12   Ross' data would not have been accessed by unauthorized individuals.

13   157.173.      Mr. Ross was a foreseeable victim of Defendants' AT&T's

14   inadequate data security practices and consent mechanisms.  As alleged fully above,

15   AT&T and its agents knew or should have known that SIM swaps presented a

16   serious threat to its customers, including Mr. Ross, before Mr. Ross' account was

17   breached for the first time.  Defendants AT&T also knew or should have known that

18   improper procedures and systems to safeguard customer data could allow its their

19   agents and employees to authorize customers' accounts and data, as occurred in the

20   2015 FCC enforcement action.

21   158.174.      AT&TDefendants knew or should have known that

22   unauthorized access would cause damage to Mr. Ross.  AT&T admitted that

23   unauthorized account access presents a significant threat to its customers, and it

24   became aware during its 2015 FCC enforcement action of the harms caused by

25   unauthorized account access.

26   159.175.      Defendants' AT&T's negligent conduct provided a means for

27   unauthorized individuals to access Mr. Ross' AT&T account data, take over control

28   of his mobile phone, and use such access to hack into numerous online accounts in

order to rob Mr. Ross and steal his personal information. As a result of Defendants' failure to prevent unauthorized accesses, Mr. Ross suffered grave injury, as alleged fully above, including severe emotional distress.  This emotional distress arose out of Defendants' breach of their legal duties.  The damages Mr. Ross suffered were a proximate, reasonably foreseeable result of Defendants' breaches of their duties.  Therefore, Mr. Ross is entitled to damages in an amount to be proven at trial.

160.176.    The injury and harm suffered by Mr. Ross was the reasonably foreseeable result of AT&T's failure to exercise reasonable care in safeguarding and protecting Mr. Ross's Personal Information, including his CPI and CPNI. AT&T's misconduct as alleged herein is malice, fraud or oppression under Civil Code § 3294(c)(1) and (2) in that it was despicable conduct carried on by AT&T with a willful and conscious disregard of the rights or safety of Mr. Ross and despicable conduct that has subjected Mr. Ross to cruel and unjust hardship in conscious disregard of his rights.  As a result, Mr. Ross is entitled to punitive damages against AT&T under Civil Code § 3294(a). Mr. Ross further alleges on information and belief that Bill O'Hern, who has been in charge of security at AT&T since 2016, and David S. Huntley, who has been in charge of privacy, had advance knowledge of the inadequacies of AT&T's security, the participation of AT&T employees in evading or bypassing security, and they committed or ratified the acts of oppression, fraud or malice alleged herein.

## COUNT V
## Concealment

177.   Plaintiff Robert Ross realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

178.   As alleged above, AT&T, including Chief Security Officer Bill O'Hern and Chief Compliance Officer David S. Huntley, who are respectively in charge of AT&T's security and privacy protections, knew that its data security

measures were grossly inadequate, that its employees and agents could readily

bypass the procedures, that its employees actively cooperated with hackers and

thieves, and that it was incapable of living up to its commitments to consumers,

including to Mr. Ross, under state and federal law, as well as under its own Privacy

Policy, to protect his Personal Information, including CPI and CPNI.

179.   Mr. Ross was unaware that AT&T's security measures did not include

low cost and readily available solutions which would have prevented his SIM swap

and resulting theft.

180.   AT&T, including Mr. O'Hern and Mr. Huntley, knew or should have

known from prior incidents and contacts with law enforcement that its system was

subject to SIM swap fraud, that its employees cooperated with hackers in such

fraud, that such fraud was prevalent in the cryptocurrency community, and that its

security measures were ineffective in preventing the fraud.  Mr. O'Hern should

have been well aware of this because he is in charge of security and AT&T and Mr.

Huntley should have known because he is in charge of insuring that AT&T protects

the privacy of its customers.

181.   AT&T did not disclose these things to Mr. Ross and willfully deceived

Mr. Ross by concealing the true facts concerning its data security, which AT&T

was legally obligated and had a duty to disclose. It did so in order to induce Mr.

Ross to remain as its customer.

182.   Had AT&T disclosed the true facts about its dangerously poor data

security practices and that is was motivated to profit from SIM swaps rather than

correct the problem, Mr. Ross would have taken further measures to protect himself

and would have ceased being a customer of AT&T.

183.   Mr. Ross justifiably relied on AT&T to provide accurate and complete

information about its data security in continuing to be AT&T's customer.  Rather

than disclosing the inadequacies in its security, including the additional security it

encouraged Mr. Ross to place on his account, AT&T willfully suppressed any

**Formatted:** Underline, Font color: Dark Red

**Formatted:** Font: (Default) Times New Roman, 14 pt, Underline, Font color: Dark Red

**Formatted:** Underline, Font color: Dark Red

1   information relating to such inadequacies.

2       184.   AT&T's actions are "deceit" under Cal. Civ. Code § 1710 in that they

3   are the suppression of a fact by one who is bound to disclose it, or who gives

4   information of other facts which are likely to mislead for want of communication

5   of that fact Because of the deceit by AT&T, it is liable under Cal. Civ. Code§ 1709

6   for "any damage which [Mr. Ross] thereby suffers."

7       185.   Because of this deceit by Defendants, Mr. Ross's Personal

8   Information, including his CPI and CPNI, as described above, was compromised

9   by hackers and he was deprived of $1 million. The connection between AT&T, the

10  SIM swap and the loss of Mr. Ross's funds is alleged hereinabove. In addition, Mr.

11  Ross's Personal Information is now easily available to hackers, including through

12  the Dark Web. Mr. Ross is further damaged to the extent of the amounts that he has

13  paid AT&T for wireless services, because those services were either worth nothing

14  or worth less than was paid for them because of lack of security. Mr. Ross has also

15  suffered substantial out-of-pocket costs because of AT&T's inadequate security.

16      186.   Because AT&T's deceit is fraud under Civil Code § 3294(c)(3) ,and

17  AT&T's conduct was done with malice, fraud and oppression, Mr. Ross is entitled

18  to punitive damages under Civil Code § 3294(a). Mr. Ross further allegeson

19  information and belief that Bill O'Hern, who has been in charge of security at

20  AT&T since 2016, and David S. Huntley, who has been in charge of privacy, had

21  advance knowledge of the inadequacies of AT&T's security, the participation of

22  AT&T employees in evading or bypassing security, and they committed or

23  ratifiedthe acts of oppression, fraud or malice alleged herein.

24

25                          **COUNT VI**
                **Negligent Supervision and Entrustment**

26      161.187.    Plaintiff Robert Ross realleges and incorporates all of the

27  preceding paragraphs as though fully set forth in this cause of action.

28

                              – 57 –

1    ~~162.~~188.      AT&T conducts its business activities through employees or

2    other agents, including One Touch Direct and One Touch Direct-SA.

3    ~~163.~~189.      ~~AT&T is~~Defendants are liable for harm resulting from their~~its~~

4    agents' and employees' because ~~AT&T~~they was reckless or negligent in employing

5    and/or entrusting agents and  work involving the risk of harm to

6    others, including Mr. Ross.

7    ~~164.~~190.      On information and belief, ~~AT&T~~Defendants knew or had

8    reason to believe that ~~its~~their agents and  employees were unfit and failed to

9    exercise reasonable care in properly investigating and overseeing them.  AT&T was

10   negligent in supervising ~~these employees~~its agents and in entrusting them with what

11   it knew to be highly sensitive confidential information.  One Touch Direct and One

12   Touch Direct-SA were negligent in supervising their agents and employees and in

13   entrusting them with what they knew to be highly sensitive confidential

14   information. ~~AT&T~~  Defendants  knew or had reason to know that ~~its~~their agents

15   and employees were likely to harm others in view of the work AT&T entrusted to

16   them.  Specifically, AT&T entrusted its agents and  employees with the

17   responsibility to conduct SIM card changes without sufficient oversight – as

18   demonstrated by ~~an AT&T employee~~the representaive and agent effectuating the

19   October 2018 SIM swap on Mr. Ross' account despite AT&T's policy disallowing

20   COAM SIM changes over the phone.

21   ~~165.~~191.      Additionally, as alleged fully above, the hacker involved in Mr.

22   Ross' SIM swap had associated numerous different SIM cards with the same device

23   IMEI in the days leading up to Mr. Ross' attack.  Despite the highly suspicious

24   nature of this activity, and AT&T's ability to track such requests, AT&T and its

25   agents failed to put any additional protections on customer accounts to prevent its

26   employees from approving additional SIM swaps to the same IMEI.

27   ~~166.~~192.      Upon information and belief, ~~AT&T~~Defendants failed to

28   exercise due care in selecting ~~its~~their agents and employees, and thereby

1  negligently or recklessly employed employees to do acts—including accessing

2  customer accounts and effectuating SIM swaps—which necessarily brought them in

3  contact with others, including Mr. Ross, while in the performance of those duties.

4  ~~167.~~193.      ~~AT&T's~~Defendants' acts, as alleged herein, were negligent in

5  that they created the risk of unauthorized account access, SIM card changes, and the

6  damages resulting therefrom.

7  ~~168.~~194.      ~~AT&T~~Defendants also failed to properly supervise ~~its~~ their

8  agents and employees, and instead continued to negligently entrust them with

9  sensitive customer data.  On information and belief, had AT&T not contracted out

10  customer service functions to third parties such as One Touch Direct and One Touch

11  Direct-SA, and had One Touch Direct or One Touch Direct-SA fired the involved

12  ~~AT&T employee or employees~~the employee when they first began to exhibit

13  suspicious SIM swap activity—including but not limited to approving SIM changes

14  that violated AT&T policy—Mr. Ross would not have been injured.

15  ~~169.~~195.      On information and belief, had ~~AT&T~~Defendants built a system

16  to effectively authenticate and verify consumer consent before allowing its agents

17  or employees to access their CPNI—as required by the FCA—Mr. Ross would not

18  have been injured.

19  ~~170.~~196.      On information and belief, had ~~AT&T~~Defendants prevented

20  individual employees from unilaterally performing SIM swaps without proper

21  oversight, Mr. Ross would not have been injured.

22  ~~171.~~197.      In sum, ~~AT&T~~Defendants gave ~~its~~ their agents and employees

23  the tools and opportunities they needed to gain unauthorized access to Mr. Ross'

24  account and failed to prevent them from doing so, thereby allowing them to use

25  AT&T's systems to perpetuate privacy breaches and thefts against Mr. Ross.

26  ~~172.~~198.      The ~~involved AT&T~~Defendants' agent(s') and employee(s')

27  actions have a causal nexus to their employment.  Mr. Ross' injuries arose out of his

28  contract with AT&T as his carrier, and AT&T's access to his CPNI and account data

– 59 –

1   as a result.  The risk of injury to Mr. Ross was inherent in the AT&T working

2   environment.

3       199.   Mr. Ross' injury was also foreseeable.  As alleged fully above,

4   AT&TDefendants were was aware of the risks that SIM swaps presented to their

5   AT&T customers.  AT&T wasDefendants were also aware that its AT&T customers'

6   accounts were vulnerable to unauthorized access by its their agents and employees,

7   as demonstrated in the 2015 FCC enforcement action. Furthermore, Mr. Ross'

8   injury was foreseeable as AT&TDefendants could have and should have seen that

9   the same hacker phone had been used in multiple previous unauthorized SIM

10  swaps.

11

12                          COUNT VI

13  Violations of California's Consumers Legal Remedies Act ("CLRA"),
                    California Civil Code § 1750 et seq.

14      173.   Plaintiff Robert Ross realleges and incorporates all of the preceding

15  paragraphs as though fully set forth in this cause of action.

16      174.   Through his counsel, Mr. Ross sent AT&T two letters via certified

17  mail on August 9, 2019 and September 13, 2019. These letters identified the

18  violations Mr. Ross planned to allege against AT&T under the CLRA.  In response

19  to these letters, AT&T did not provide any meaningful settlement offer to Mr. Ross.

20      175.   As an AT&T customer, Mr. Ross engaged in transactions with AT&T

21  concerning his mobile service.  Mr. Ross sought and acquired services from AT&T

22  for his personal, family and household purposes.

23      176.   AT&T has engaged in unfair methods of competition and unfair or

24  deceptive acts or practices intended to result and which did result in the sale of

25  mobile services to Mr. Ross, as detailed herein.

26      177.   AT&T's acts and representations concerning the safeguards it employs

27  to protect consumer account data – including Mr. Ross' data – is likely to mislead

28  reasonable consumers, including Mr. Ross, as detailed herein.

178.   AT&T has represented that its goods or services have characteristic and/or benefits that they do not have.  Specifically, AT&T represented that, in purchasing AT&T mobile service and using AT&T compatible phones, Mr. Ross' confidential data would be safeguarded and protected as alleged fully above.

179.   In actuality, as alleged fully above, AT&T's mobile service did not protect and/or safeguard Mr. Ross' data from unauthorized access, and AT&T's employees did in fact obtain unauthorized access to customers' personal information, as detailed herein.

180.   AT&T's misrepresentations and omissions concerning its safeguarding of customers' account data were materially misleading.  As alleged fully above, a reasonable person would attach importance to the privacy of his sensitive account data in determining whether to contract with a mobile phone provider.

181.   AT&T was obligated to disclose the shortcomings of its data protection practices, as AT&T had exclusive knowledge of material facts not known or knowable to its customers, AT&T actively concealed these material facts from its customers, and such disclosures were necessary to materially qualify its representations that it took measures to protect consumer data and its partial disclosures concerning its use of customers' CPNI.  Further admissions were necessary to prevent AT&T's statements from misleading the public in light of the undisclosed facts concerning its security procedures.

182.   Further, AT&T was obligated to disclose its practices—by seeking consent beforehand or informing customers of breaches in the aftermath—under the FCA.

183.   AT&T's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Mr. Ross, as alleged fully above.

184.   Mr. Ross seeks injunctive relief, damages—including actual, statutory, and punitive damages—and attorneys' fees for AT&T's violations of the CLRA. He seeks public injunctive relief against AT&T's unfair and unlawful practices in

1  ~~order to protect the public and restore to the parties in interest money or property~~
2  ~~taken as a result of AT&T's unfair methods of competition and unfair or deceptive~~
3  ~~acts or practices.  Mr. Ross seeks a mandatory cessation of AT&T's practices and~~
4  ~~proper safeguarding of confidential customer account data.~~
5  **COUNT V~~I~~I**
   **Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

6  ~~185.~~200.    Plaintiff Robert Ross realleges and incorporates all of the
7  preceding paragraphs as though fully set forth in this cause of action.

8  ~~186.~~201.    Mr. Ross' mobile device is capable of connecting to the
9  Internet.

10  ~~187.~~202.    ~~AT&T~~Defendants' agents and employees, in the scope of their
11  employment, intentionally accessed Mr. Ross' mobile device, and assisted others in
12  accessing his mobile device, without Mr. Ross' authorization, in order to assist
13  hackers in their theft of Mr. Ross.

14  ~~188.~~203.    The ~~AT&T~~Defendants agents and employees took these actions
15  knowing that they would cause damage to Mr. Ross' mobile device, as well as
16  damage to the information located on his mobile device.

17  ~~189.~~204.    The ~~AT&T~~Defendants agents and employees caused Mr. Ross'
18  mobile device and much of the data on it to be unusable to him.

19  ~~190.~~205.    Because of the ~~AT&T~~Defendants' agents' and employees'
20  actions, Mr. Ross suffered damage to his mobile device and damage to information
21  on his mobile device, including being unable to access information and data on his
22  mobile device and being unable to access his personal accounts, including his
23  personal (e.g. Gmail) and financial (e.g. cryptocurrency and PayPal) accounts.

24  ~~191.~~206.    The act of swapping Mr. Ross' AT&T mobile SIM card was in
25  the scope of the ~~AT&T~~Defendants' agents and employees' work.

26  207.    Further, Mr. Ross spent in excess of $5,000 investigating who
27  accessed his mobile device and damaged information on it.
28

– 62 –

1

2  **VII.  PRAYER FOR RELIEF**

3      ~~192.~~208.        WHEREFORE, Plaintiff Robert Ross requests that judgment be

4  entered against Defendant<u>s</u> and that the Court grant the following:

5          A.      Judgment against Defendant<u>s</u> for Plaintiff's asserted causes of action;

6          B.      Public injunctive relief requiring cessation of Defendant<u>'s'</u> acts and

7                  practices complained of herein pursuant to, *inter alia*, Cal. Bus. &

8                  Prof. Code § 17200~~, and~~ <u>47 U.S.C. § 401(b)~~, and Cal. Civ Code §~~</u>

9                  ~~1780;~~;

10         C.      Pre- and post-judgment interest, as allowed by law;

11         D.      An award of monetary damages, including punitive damages, as

12                 allowed by law;

13         E.      Reasonable attorneys' fees and costs reasonably incurred, including

14                 but not limited to attorneys' fees and costs pursuant to 47 U.S.C. §

15                 206; and

16         F.      Any and all other and further relief to which Plaintiff may be entitled.

17

18                          <u>**DEMAND FOR JURY TRIAL**</u>

19      Plaintiff demands a trial by jury of all issues so triable.

20

21    DATED:-

22                              CHRISTOPHER GRIVAKES

23                              AFFELD GRIVAKES LLP

24

25                              By:  /s/ DRAFT

26                                        Christopher Grivakes

27                              Attorneys for Plaintiff ROBERT ROSS

28

– 63 –

1

2     Dated: October 17, 2019              Respectfully submitted,

3                                              /s/ Thomas D. Warren
4                                          Thomas D. Warren (SBN 160921)
                                           twarren@piercebainbridge.com
5                                          Andrew Calderón (SBN 316673)
                                           acalderon@piercebainbridge.com
6                                          PIERCE BAINBRIDGE BECK PRICE
                                           & HECHT LLP
7                                          355 S. Grand Avenue, 44th Floor,
                                           Los Angeles, CA 90071
8                                          Telephone: (213) 262-9333
9                                          Facsimile: (213) 279-2008

10                                         Dwayne D. Sam (*pro hac application
11                                         forthcoming*)
                                           dsam@piercebainbridge.com
12                                         PIERCE BAINBRIDGE BECK PRICE
                                           & HECHT LLP
13                                         600 Pennsylvania Avenue NW
14                                         South Tower, Suite 700
                                           Washington, DC 20004
15                                         Telephone: (202) 843-8342
16                                         Facsimile: (646) 968-4125

17

18

19

20

21

22

23

24

25

26

27

28