# AFFELD GRIVAKES LLP

2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Tel:  (310) 979-8700
Fax: (310) 979-8701

March 23, 2021

**Case 4:19-cv-06669-JST-DMR; Ross v. AT&T Mobility LLC et al.**

Dear Magistrate Judge Ryu:

This letter is being submitted in connection with Mr. Ross's written first set of Interrogatories and Requests for Production to AT&T.  Counsel for the parties have met and conferred telephonically three times in an effort to narrow and resolve their disputes from November 2020 through March 23, 2021.

The relevant case management dates are as follow: Close of Fact Discovery due by 7/8/2021. Designation of Experts due by 7/22/2021. Designation of Rebuttal Experts due by 8/26/2021. Close of Expert Discovery due by 9/14/2021. Dispositive Motion due by 10/12/2021. Pretrial Conference set for 2/3/2022. Jury trial set for 2/28/2022 - 3/11/2022.

Mr. Ross alleges that he experienced an unauthorized "SIM swap" of his AT&T mobile phone service on October 26, 2018. Mr. Ross further alleges that a hacker convinced a customer service representative at a third-party AT&T call center to change the SIM card number connected with Mr. Ross's mobile phone service which gave the hacker control of Mr. Ross's online and financial accounts and stole his approximately $1 million life savings and files from Mr. Ross. The alleged hacker was arrested and is now being prosecuted by the Santa Clara County District Attorney's Office.  Mr. Ross seeks to recover damages from AT&T as a result of his allegations; AT&T disputes Mr. Ross's allegations.

**Ross Statement**.  AT&T's contention that some of the disputes are premature or have been resolved by the parties is belied by the lengthy history of meet and confers over the last several months and the contents of this letter.  Mr. Ross's March 17 letter was his third written attempt to distill the issues before the fourth and final telephonic meet and confer that precipitated this letter.  Mr. Ross eliminated several categories from the original draft of this letter based on AT&T's claims of prematurity.  AT&T has not agreed to supplement any of the categories in dispute as set forth below.

**AT&T Statement:** Many of the disputes that Mr. Ross raises herein are premature or have been resolved by the parties. Nonetheless, on March 17, Mr. Ross provided a four-page letter to AT&T without explanation for his sudden acceleration of a process that had narrowed, and was continuing to narrow, the parties' disputes.  Mr. Ross announced that he would file the letter the next day as a "joint" letter "with or without AT&T's input." AT&T objects to Mr. Ross's violation of Paragraph 14 of the Court's discovery procedures and to his attempt to preclude AT&T from meaningful input on this discovery dispute.  The majority of issues raised in Mr. Ross's letter—even after he removed several improper issues from his original draft—are either resolved or not ripe for the Court's involvement, making this letter an unnecessary burden on the Court.

Magistrate Judge Ryu
Page 2

Nonetheless, AT&T briefly discusses the issues raised below.

On September 28, 2020, Mr. Ross propounded his first set of written discovery to AT&T. The parties disagree as set forth below.

**Notice Issues**. (1) Mr. Ross requested that AT&T state the number of unauthorized SIM swaps reported to AT&T by its customers from 2013 to the present (Rog No. 1). AT&T agreed to supplement but proposed limiting the time frame to commence January 1, 2018. **Mr. Ross's position**. The request goes to the heart of the case, *i.e.*, whether AT&T was on notice of their growing SIM swap problem sufficiently in advance of Mr. Ross's SIM swap to develop and implement measures to combat the problem. The amount of time AT&T was on notice, and the growing scope of the problem, are *directly* relevant to Mr. Ross's claims of recklessness and request for punitive damages. Mr. Ross did not, and does not, agree to AT&T's proposed temporal limitation to restrict discovery to January 1, 2018, and has sent three writing to AT&T to that effect starting December 17, 2020.  AT&T's proposed temporal limitation is an attempt to conceal the true scope of the growing problem it has been aware of for many years.  The request is proportional to the case because AT&T has sole access to the information, the evidence is key to the issue of liability, and the benefit far outweighs any nominal burden to AT&T. **AT&T's position.** Mr. Ross's request seeks information that is not relevant and is not proportionate to the needs of this case. This case addresses Mr. Ross's claimed SIM swap, and the measures that AT&T had in place *at the time of that claimed SIM swap* to prevent it.  Nonetheless, in an attempt to compromise, the parties agreed that AT&T would supplement its request to state the number of unauthorized SIM swaps since January 1, 2018 (through the date as of which the information was calculated). Unauthorized SIM swaps are an extremely small percentage of all SIM swaps.  Recently, Mr. Ross retracted the parties' agreement to again request information dating back to January 1, 2013. AT&T has objected to this expansion; Mr. Ross has not been able to explain why the number of allegedly unauthorized SIM swaps nearly *six years* before the alleged October 26, 2018 SIM swap involving Mr. Ross has any bearing on this case.  Whatever tangential relevance the number of SIM swaps could have, producing such information from January 1, 2018 is fully adequate.

(2) Mr. Ross requested that AT&T provide the *dates* that the hacker used the same phone or SIM card to conduct unauthorized SIM swaps of other AT&T customers before Mr. Ross was SIM swapped (Rog No. 21). **Mr. Ross's position**. Mr. Ross did *not* ask for any information identifying those other victims.  AT&T has steadfastly refused to provide the requested information since the meet and confer process started many months ago, and reiterated in writing, including most recently in the letter of March 2 which teed up the issues for the March 11 telephonic meet and confer.  This information is highly relevant to notice and negligence. The request is proportional and readily available; indeed, AT&T provided this information to law enforcement. **AT&T's position**. Mr. Ross's assertion that AT&T refused to provide this information is incorrect, and this issue is premature. In prior discussions, Mr. Ross more generally sought information exchanged with REACT, which AT&T repeatedly told Mr. Ross that it will provide to the extent possible without disclosing other customer information.  As this litigation shows, AT&T must carefully navigate confidentiality issues to ensure that it does not make disclosures that are, or can be perceived to be, improper. Mr. Ross recently shifted his focus to this date issue specifically, which AT&T agreed to investigate. Mr. Ross short-circuited AT&T's consideration by rushing to Court. AT&T can respond to the panoply of issues Mr. Ross has raised (many of which are new) by March 31. At this time, there is no ripe issue for the Court to address.

(3) Mr. Ross asked AT&T to produce all documents authored by any officer, manager or

employee on the issue of unauthorized SIM swaps (RFP 1). ***Mr. Ross's position***. AT&T has promised documents for months but has not produced a single email about SIM swaps, or provided a date when it expects to produce documents in response to its belated offer to search for documents more than five months after the discovery was served. AT&T is plainly stonewalling on an issue at the center of this case in order to run down the clock and prevent follow-up discovery. At a minimum, AT&T should promptly produce documents authored or received by the persons listed in AT&T's Rule 26 Disclosures, its Interrogatory responses, Johannes Jaskolski, AT&T's AVP of Cybersecurity, and Bill O'Hern, AT&T Chief Security Officer, whom Mr. Ross believes is on the board of ZenKey. ***AT&T's position***. AT&T is not stonewalling; discovery in this case has moved steadily and symmetrically, with delays accompanying motion practice on Mr. Ross's belated amended complaint and the schedule extensions required by Mr. Ross's addition of a new defendant. Far from being "belated," AT&T has long said it would conduct a reasonable search for responsive documents. And AT&T has not only *promised* further production, it has *produced* numerous documents authored by AT&T employees pertaining to unauthorized SIM swaps. AT&T has told Mr. Ross that it will begin producing custodial documents in the next two weeks. AT&T is searching custodians including Ray Hill, Joe Morella, Carson Proctor, Brian Rexroad, Valerie Scheder, Kristi Parrott, and Johannes Jaskolski. AT&T does not believe Bill O'Hern is an appropriate custodian, but that issue will be better considered once the relevant custodians' documents are produced.

**Payments**. Mr. Ross requested that AT&T state the total dollar amount paid out to customers on unauthorized SIM swap claims (Rog No. 6). ***Mr. Ross's position***. This information is relevant to whether AT&T has had a financial incentive to avoid fixing the problem and instead sought to profit from it, *e.g.*, if it paid nothing on SIM swap claims, but projects billions in profits from its ZenKey post-SIM swap solution currently being marketed to financial institutions. The request is proportional to the case because AT&T has sole access to the information, the evidence is relevant to the issue of punitive damages, and the benefit far outweighs any nominal burden to AT&T. AT&T's contention that it would have to look into confidentiality provisions of each settlement is disingenuous: Mr. Ross is asking for an aggregate number, not cases specific information. ***AT&T's position***. The amount of money that AT&T has paid to all customers on any SIM swap claim is not relevant or proportionate to whether Mr. Ross in fact suffered a loss from a SIM swap or whether that loss (if suffered) was attributable to AT&T. Mr. Ross's conclusory assertion that this is relevant to whether AT&T has a financial incentive to avoid fixing the problem is illogical. Whether AT&T has paid a lot or a little to other customers, its incentive is plainly to prevent criminal hackers from stealing from its customers. No answer to this request could suggest otherwise. Mr. Ross's request for discovery into every amount paid to any customer on any unauthorized SIM swap based on this single event and alleged loss is unwarranted. Moreover, AT&T would have to review any relevant settlement agreement individually to ensure that no response to this interrogatory could violate any confidentiality agreement. Particularly given the lack of relevance, there is no basis to put this burden on AT&T.

**Measures to Combat Unauthorized SIM Swaps.** Mr. Ross requested that AT&T state the measures implemented to combat unauthorized SIM swaps for each year from 2013 to the present (Rog No. 9), and documents to show which measures were implemented before and after his SIM swap (RFP 13, 22). ***Mr. Ross's position***. Mr. Ross disagrees with AT&T's arbitrary cut-off of the dates it implemented various security measures and did not agree to the temporal limitation of January 1, 2018. The dates are relevant to determine which measures AT&T took, if any, while it knew of their SIM swap problem that has grown larger over the last several years.

Magistrate Judge Ryu
Page 4

The request is proportional to the case because AT&T has sole access to the information, the evidence is relevant to the issue of punitive damages, and the benefit far outweighs any nominal burden to AT&T.  **AT&T's position.**  Mr. Ross's statement that AT&T has refused to provide implementation dates for the measures identified in response to Interrogatory No. 9 is false.  In fact, AT&T has agreed to produce responsive documents from January 1, 2018 to the present and has agreed to supplement its already extensive response to Interrogatory No. 9 with further date information, even for measures adopted prior to 2018.  There is no ripe dispute here.

> **ZenKey.**  Mr. Ross has propounded a single interrogatory (Rog No. 25) and several requests for production about ZenKey (which includes predecessors called Project Verify and the Mobile Authentication Task Force) (RFP Nos. 35-47).  AT&T has refused to produce any documents or answer the interrogatory about ZenKey.  **Mr. Ross's position**. ZenKey (f/k/a Project Verify and the Mobile Authentication Task Force) is perhaps the most critical aspect of this case. Mr. Ross alleges that AT&T took half-hearted measures to combat the SIM swap problem and deliberately ignored implementing readily available and relatively low-cost technology solutions to fix its SIM swap problem which has been growing for several years because it made a strategic decision to *profit* from the problem through its ZenKey venture. (FAC, ¶¶ 100-105).  Mr. Ross alleges that AT&T invested over a hundred million dollars into ZenKey, a joint venture with the 2 other major U.S. mobile phone carriers, that offers a *for-profit* post-SIM swap solution to financial institutions to prevent the theft of funds *after* an unauthorized SIM swap has occurred.  (FAC, ¶ 102-105). ZenKey's publicly available marketing materials confirm its essential purpose, and showcase its core revenue generating features as a solution to mitigate theft after an unauthorized SIM swap has occurred (https://myzenkey.com/trust-services/), rather than what AT&T and its 2 carrier partners should have done: fix their actual SIM swap problem.  Johannes Jaskolski, AT&T's AVP Cybersecurity *and* GM of ZenKey, has stated in publicly available videos when presenting ZenKey and discussing unauthorized SIM swaps, "*Project Verify is not vulnerable to SIM swaps*", "*I want to design it in a way that any service provider [i.e. financial institution] will regret if they don't onboard it*", *"the service providers will have to pick up some of the costs",* and *"This is like at the chairman level of all 4 carriers." (*https://www.youtube.com/watch?v=NgpA2Dxln-0*)*. ZenKey was in development over a year before the SIM swap against Mr. Ross, and was created as the direct result of AT&T's formation of the Mobile Authentication Task Force, launched on Sep 8, 2017 with the other major U.S carriers.[1] On Sept. 12, 2018 (over a month before the subject SIM swap), AT&T and its partners announced the task force launch of "Project Verify."[2] (). On Oct 1, 2019, AT&T announced the public unveiling of ZenKey by the task force.[3]

> If Mr. Ross proves his allegations, AT&T should be subject to liability for not only negligence but also punitive damages for intentional misconduct by callously disregarding the safety and privacy of their own customers in order to profit from the very same problem, which it created, causing devastating harm to its customers. Mr. Ross replied in writing on March 2, 2021 that he would agree to limit his requests relating to ZenKey to the following: (1) the identities and ZenKey roles of AT&T's past and present officers, managers and directors who have or held positions at ZenKey; (2) the amounts and dates of AT&T's investments in ZenKey; (3) ZenKey's

---

[1] https://about.att.com/story/att_teams_to_develop_mobile_authentication_solution.html
[2] https://krebsonsecurity.com/2018/09/u-s-mobile-giants-want-to-be-your-online-identity/
[3] https://www.prnewswire.com/news-releases/mobile-authentication-taskforce-to-unveil-zenkey-at-mwc-los-angeles-300928271.html

Magistrate Judge Ryu
Page 5

detailed financial projections from conception to the present; and (4) communications between Johannes Jaskolski (AT&T's AVP Cybersecurity *and* GM of ZenKey) and Bill O'Hern (AT&T's Chief Security Officer) relating to unauthorized SIM swaps, including as they relate to ZenKey. This information is clearly relevant, proportional, and easily obtainable.

*AT&T's position.* Mr. Ross's ZenKey requests are improper both in their general subject matter and in the specific requests. That is, all of the requests are improper because ZenKey is not relevant to this case, and Mr. Ross's fishing expedition to build out a conspiracy theory that AT&T allows theft to occur is unsupported speculation. There is nothing in the quoted language above that even remotely suggests a disregard for customer privacy or any conduct warranting liability or damages of any sort. Discovery cannot be fueled purely by fanciful musings. There are limits.

As an initial matter, some clarity is necessary about what ZenKey is and is not. ZenKey is a technology developed by a collaboration among AT&T, T-Mobile, and Verizon, with the aim "to build a more secure, multifactor identity authentication platform for all." About ZenKey, https://myzenkey.com/about/. It is not a measure developed to address SIM swaps in particular; it is a broader effort at creating an authentication platform that could have benefits for users with respect to SIM swaps. ZenKey is *not* something used by, or available to, Mr. Ross. It went live on September 17, 2020, nearly two years after the claimed SIM swap. Mr. Ross's baseless conjecture is not that ZenKey was available earlier but was not used, but that AT&T was focused on ZenKey and should have adopted other solutions to the problem of unauthorized SIM swaps. Setting aside the utter implausibility of the theory that AT&T intentionally aided criminals, details of how ZenKey works, its funding, and the details of its finances have nothing to do with whether AT&T could have, but did not, employ *other* security measures beside ZenKey. Whether AT&T invested in ZenKey, which individuals worked on it, and what its financial projections are has *nothing to do* with whether AT&T acted with due care, consistent with its contract, and consistent with law in addressing SIM swaps two years before ZenKey was live. Moreover, because ZenKey is a collaboration of AT&T, T-Mobile, and Verizon, AT&T would have to address confidentiality obligations to those other entities before it could produce sensitive documents regarding ZenKey, an unwarranted burden given the irrelevance of the information.

Moreover, Mr. Ross's particular requests are improper. It is public information that Johannes Jaskolski, an AT&T employee, is general manager of ZenKey.[4] Mr. Ross provides no basis for further exploration into ZenKey's management. With respect to Mr. Ross's request for information on AT&T's investments, it makes no sense in light of Mr. Ross's relevance theory, which is based on an imagined profit motive for AT&T, AT&T's investments are not part of that fantasy. Similarly, ZenKey's financials are not relevant; indeed, because it is a joint venture, the financial projections for ZenKey are not even applicable to AT&T. Finally, AT&T has agreed to produce communications between Mr. Jaskolski and Mr. O'Hern regarding to unauthorized SIM swaps. It is possible that some documents that refer to SIM swaps may also refer to ZenKey, and AT&T has agreed to produce such documents. What AT&T objects to doing is searching for documents that probe ZenKey but have no relevance to unauthorized SIM swaps. Accordingly, if ZenKey is referenced in connection with unauthorized SIM swaps, Mr. Ross will have that information. What Mr. Ross wants is for AT&T to search for *irrelevant* ZenKey information. This is improper.

---

[4] https://www.verizon.com/about/news/us-wireless-providers-consumer-brands-zenkey

Magistrate Judge Ryu
Page 6

| Very truly yours, | Very truly yours, |
|---|---|
| */s/Christopher Grivakes* | */s/Marcellus McRae* |
| Christopher Grivakes | Marcellus McRae |